Joseph D. SLEVIN, Plaintiff,

v.

PEDERSEN ASSOCIATES, INC.,
Jasmine Interior Design Inc. and
Enok Pedersen, Defendants.

No. 80 Civ. 6318 (KTD).

United States District Court,
S. D. New York.

May 20, 1982.

Cadwalader, Wickersham & Taft, New York City, for plaintiff; Gerald T. Slevin, Michael G. Dolan, New York City, of counsel.

Richard A. Rifas, New York City, for defendants.

MEMORANDUM AND ORDER

KEVIN THOMAS DUFFY, District Judge:

Joseph Slevin brought this suit against defendants Pedersen Associates, Inc. and Jasmine Interior Design, Inc., both New York corporations engaged in the business of general carpentry, and Enok Pedersen, individually and as an officer, director and principal shareholder of both Pedersen Associates, Inc. and Jasmine Interior Design, Inc., to recover his twenty-five thousand dollar investment and punitive damages re-

sulting from the defendants' alleged fraud and misrepresentations. Plaintiff's federal action is based on violations of the federal securities laws and pendent jurisdiction.[1]

▮ Slevin alleges that he was fraudulently induced by the defendants to invest $25,000 in a project designed to develop pre-fabricated homes on Margarita Island, off the coast of Venezuela. Slevin contends that this investment constitutes a "security" within the meaning of the federal securities law and that therefore plaintiff is entitled to relief in federal court for defendants' supposed violations of these laws. Defendants move for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) arguing that the interest acquired by Mr. Slevin was nothing more than a partnership interest and did not amount to a security. Plaintiff cross-moves for partial summary judgment on the security question.[2]

## BACKGROUND

In the Fall of 1976, Mr. Slevin met with his long-time friend Enok Pedersen to discuss the possibility of investing in Pedersen's plan to construct pre-fabricated houses on Margarita Island. Slevin alleges that Pedersen informed him that James Tagoni and Pedersen intended to construct over 5,000 houses on Margarita to respond to the island's housing needs. An investment of $25,000 was made by Slevin in return for a one-third share in the profits. Although legal counsel was available to him, Slevin Affidavit, ¶ 9, the plaintiff never requested the issuance of stock certificates or even the reduction to writing of his arrangement with his friend. The parties agree that it was not anticipated at that time that the plaintiff would "contribute any additional money, services or labor to the venture."

1. Specifically, suit is brought under Section 12(1), 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1), 77*l*(2) and 77q(a); and Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.10b–5; and the law of New York.

2. In support of their motion for judgment on the pleadings, defendants submitted affidavits. Plaintiff in turn deemed defendants' motion one for summary judgment because it relied on

Affidavit of Enok Pedersen. This original intention, however, is refuted by plaintiff's subsequent actions.

A number of weeks after Slevin's investment, he was laid off from his job as an operating engineer. Slevin thereafter visited Pedersen's Long Island City, New York offices and voiced his displeasure with the delay on the Margarita project and the effort being exerted by Pedersen. The parties dispute the extent of Slevin's subsequent participation; Slevin disavows any involvement in the management of the project, while Pedersen asserts that plaintiff's contribution was substantial. It is assumed, therefore, that plaintiff's version of his activity as set forth in his affidavit quoted below describes at least the minimum level of his involvement.

7. When I saw that the project was not moving as represented to me, I gave Mr. Pedersen the name of a friend of mine, Mr. Berven, who had a trucking concern and who could arrange for delivery of certain materials purchased by Pedersen for the project from New York to Baltimore where they could be shipped to Venezuela. I gave Pedersen my friend's name since Pedersen apparently was not familiar with any truckers who could provide this service. In addition to giving Pedersen the name of Mr. Berven, I participated in physically loading the materials onto the trucks for shipment. That was the extent of my participation. I did not have anything to do with the purchase of these materials, making an inventory of the goods, supervising the loading of the materials or making of payments to Mr. Berven.

\*    \*    \*    \*    \*    \*

affidavits outside the pleadings. In turn, the plaintiff responded with its own cross motion for partial summary judgment. Defendants' failure to respond to either plaintiff's designation of their motion as one for summary judgment or plaintiff's own summary judgment motion, allows this court to treat the motions before it as ones for summary judgment without further notice to the parties.

To the best of my recollection, I worked at Mr. Pedersen's office for a period of approximately three weeks and not on a daily basis during those weeks. I did not perform services through May of 1977 as Mr. Pedersen states in his affidavit, nor did I participate in the management of the project. My services consisted of physical labor and performing minor clerical functions.

9. In February of 1977, I did make a trip to Florida to load some material for use on the Margarita Island project. Pedersen and Tagoni had arranged for the purchase of materials from a corporation in Florida. They were also negotiating with various shipping agencies to have the materials shipped from Florida to Venezuela. I did not participate in any of these actions. When I saw that Pedersen was just not getting the material moved, I offered to go to Florida and load the material. I then went to Florida and physically loaded the materials purchased by Pedersen and Tagoni onto a truck. Someone else then arranged to have the material placed on a ship and sent to Venezuela. I had no participation in the purchasing of this material, payment for the material or disposition of the material and use of the material in Venezuela. My sole participation was to travel to Florida and physically load the material on trucks.

\*      \*      \*      \*      \*      \*

My sole participation in the project after making my investment was to provide physical labor in loading a truck in New York and loading a truck in Florida and to perform certain minor clerical services for Mr. Pedersen during a short period of time while I was laid off from my job.

Affidavit of Joseph D. Slevin.

Pedersen presents a different view of the facts. He alleges that Slevin became actively involved in the management of the Margarita project and that this participation was manifested by phone calls, travel, assistance in the transportation of supplies, sending of a money order and the recommendation of a trucking company. What-

ever Slevin's services to the venture consisted of, he was not paid nor treated as an employee. He is not now seeking such wages nor apparently has he done so in the past.

## ANALYSIS

The threshold inquiry in this case is whether Slevin has alleged facts sufficient to substantiate the application of the securities law to this case. Without the coverage of the securities law, plaintiff's complaint lacks federal question jurisdiction. As the complaint does not state facts sufficient to support diversity jurisdiction, subject matter jurisdiction will only exist if the securities laws apply.

A motion for summary judgment may not be granted if material issues of fact are presented. Fed.R.Civ.P. 56(c). Certain facts in both Slevin and Pedersen's affidavits are contested. It remains to be determined, however, if the contested facts are material, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962), a task left to a judge's "informed and properly reasoned judgment." *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theaters, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967). In order to arrive at a reasoned judgment on the issue of materiality in this case, it is necessary to examine the legal definition of a security as found in the federal securities laws. If after this investigation, it becomes apparent that a disputed fact will alter the outcome of the motions, summary judgment must be denied.

Plaintiff argues that his $25,000 investment constitutes an investment contract, one of many instruments which Congress specifically brought within the "security" rubric. 15 U.S.C. § 78c(a)(10); 15 U.S.C. § 77b(1). In *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court set out its watershed definition of an investment contract: "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts

of others." *Id.* at 301, 66 S.Ct. at 1104. The Supreme Court held that a land sales contract for units of a citrus grove offered jointly with a service contract for cultivating and marketing the crops, was an "investment contract" and hence a security. The Court reasoned that the enterprise was an opportunity to contribute money and share in the profits of a large citrus fruit enterprise managed and partly owned by third parties. The purchasers did not contemplate possessing or managing the enterprise, but were attracted only "by the prospects of a return on their investment." *Id.* at 300, 66 S.Ct. at 1103.

The meaning and applicability of the *Howey* test has been extensively litigated, and there is considerable case law devoted to unraveling the extent of investor participation which will prevent an investment contract from qualifying as a security. *See, e.g., United States Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Golden v. Garofalo*, 678 F.2d 1139 (2d Cir. 1982); *1050 Tenants Corp. v. Jakobson*, 503 F.2d 1375 (2d Cir. 1974); *Hirsch v. duPont*, 396 F.Supp. 1214 (S.D.N.Y.1975), *aff'd*, 553 F.2d 750 (2d Cir. 1977). The *Howey* test has been broken down into three distinct parts: (i) an investment of money, (ii) in a common enterprise, (iii) with profits to come solely from the efforts of others. *Savino v. E. F. Hutton & Co., Inc.*, 507 F.Supp. 1225, 1236 (S.D. N.Y.1981). The parties agree that the first two elements of the *Howey* test have been met. The final element, whether Mr. Slevin expected his profits to be derived *solely* from the efforts of Pedersen and Tagoni, provides the crux of the instant motions.

The resolution of this controversy would normally depend on whether "solely" is interpreted literally (i.e., did plaintiff contribute in any manner to the project) or liberally (i.e., did the plaintiff provide only ministerial, nonmanagerial help). I prefer an approach which goes beyond an interpretation of the word "solely" and takes into account the "economic reality" of the contract in issue. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). The recent decision of the Second Circuit in *Golden v. Garofalo, supra,* does not militate against consideration of the contract's economic reality. It may be argued that *Golden* has reduced the applicability of the securities law to a simplistic examination of the form or name given to the transaction device and that since this transaction is referred to as an investment contract the instant action is cognizable under the securities laws. This argument misreads the *Golden* decision. A lizard with a sign around its neck reading "dog" does not change the lizard into a Labrador retriever. The *Golden* decision stands merely for the proposition that summary judgment is not available to dismiss a complaint under the securities laws by the invocation of the "Sale of Business Doctrine" where the transaction clearly involves corporate stock. The economic reality test, however, remains valid for investment contracts. Indeed, the court specifically stated: "Congress thus may have had good reason to draft the definition of 'security' so as to include all instruments having commonly agreed upon characteristics, such as 'stock' leaving 'economic reality' to govern only the catch-all phrase 'investment contract' in cases involving unusual or unique instruments." *Golden, supra,* 678 F.2d at 1146–1147. Utilizing the economic reality test, the facts in this case lead to the conclusion that the parties' behavior is beyond the contemplated boundaries of the securities laws.

Slevin and Pedersen enjoyed a long standing and close relationship. This led to the inclusion of the plaintiff in his friend's business scheme. The limited number of parties involved or anticipated to become involved in the venture is conceded by Slevin. Although it may not have been foreseen at the time of the parties' agreement that Slevin would contribute to the management of the scheme, subsequently when he offered assistance, the assistance was accepted as one would accept the help of a friend and business partner. The situation is analogous to a general partnership where:

> ... The general partners of a partnership are not passive investors who place

money in an enterprise with the expectation of deriving profits *solely* from the efforts of others. Rather, they expect to reap profits through their own active participation in the control and management of the business.

Jennings & Marsh, Securities Regulation, at p. 252 (4th ed. 1977).

■ The original intention of the parties is crucial to the classification of their contract, *Wasnowic v. Chicago Board of Trade*, 352 F.Supp. 1066, 1070 (M.D.Pa. 1972), *aff'd*, 491 F.2d 752 (3d Cir. 1973), *cert. denied*, 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974), and this intent is reflected by certain key facts. One, no stock was issued. Indeed, it is unclear what corporate or other legal entity was to be used as a vehicle for the venture. Two, there is no writing which records the intent of the parties at the time that plaintiff made his investment. That there may have been an agreement or contract to invest is clear. But a "contract to invest" is not necessarily an "investment contract" within the meaning of the securities laws.

The securities laws were enacted to provide surveillance for those not in a position to monitor their own investments or in the words of the legislative history to protect those who "cannot personally watch the managers of all his interests as one horse trader watches another." H.R.Rep. No. 1383, 73d Cong., 2d Sess. 5 (1934). The securities laws protect the integrity of financial interests that unsuspecting investors are incapable of investigating for themselves. The free assignability of most securities has buttressed the need for this statutory protection. The assignment of an interest increases the likelihood that an investor will be further removed from the "horse race." It does not appear that the parties here contemplated assignment of their joint venture or partnership interest to any third party. The spirit of the investment contract definition as enunciated in *Howey* was not meant to encompass an oral agreement between friends to pioneer a market and closely follow the progress of the project. The lack of Slevin's remoteness from the tangible product of his capital investment renders it unnecessary to extend the protection of the securities laws to this situation.

Since there is no written statement which delineates the intent of the parties at the time plaintiff made his investment, that intent becomes clear from the relationship which the parties accepted thereafter. The plaintiff felt free to work directly on the venture. When plaintiff thought that the venture was not moving along at a proper rate, he rendered his services freely— whether the services be ministerial or managerial does not matter—his accepted ready access to the business of the venture shows that he was not a passive investor.

■ The reality of the situation presented by the instant case is that the plaintiff made an investment in a joint venture with the individual defendant. The joint venture in which the plaintiff invested was a type of partnership and was not a security.

The disputed facts were not considered in my analysis and thus render the motions ripe for summary judgment. Common sense dictates that when an interest which is not freely assignable is purchased under the conditions herein, the securities laws will not apply. This ruling does not address Slevin's allegations of fraud nor the propriety of redress for the alleged wrong. My ruling does suggest, however, compliance with the Supreme Court's recent ruling. "... [W]e are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." *Marine Bank v. Weaver*, —— U.S. ——, ——, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). Accordingly, summary judgment on the federal claims is granted in favor of the defendants.

Plaintiff's remaining claims involve matters of state law. It seems improvident to exercise pendent jurisdiction over state claims when the federal claims have been dismissed in pretrial motions. *See McLearn v. Cowen & Co.*, 660 F.2d 845, (2d Cir. 1981). The state claims are hereby dismissed.

Plaintiff's complaint is dismissed in its entirety.

SO ORDERED.