**Gene MARITAN, Plaintiff/Appellant,**

v.

**BIRMINGHAM PROPERTIES, an Oklahoma limited partnership; Edwin Kronfeld, individually and as surviving general partner of Birmingham Properties, an Oklahoma limited partnership; and The First National Bank and Trust Company of Tulsa, a national banking association, as successor personal representative of the estate of F. Paul Theiman, deceased, Defendants/Appellees.**

No. 87–1287.

United States Court of Appeals, Tenth Circuit.

March 17, 1989.

Publication Ordered May 23, 1989.

**1452**

James W. Tilly, James W. Tilly, P.C., Tulsa, Okl., for plaintiff/appellant.

James C. Lang (Kevin C. Leitch, with him on the brief), Sneed, Lang, Adams, Hamilton & Barnett, Tulsa, Okl., for defendants/appellees Edwin Kronfeld and Birmingham Properties.

James E. Weger, Jones, Givens, Gotcher, Bogan & Hilborne, Tulsa, Okl., for defendant/appellee The First Nat. Bank & Trust Co. of Tulsa.

Before ANDERSON, BARRETT and BRORBY, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Gene Maritan appeals from an adverse summary judgment dismissing his action under the federal securities laws, and pendent state law claims, against Birmingham Properties, an Oklahoma limited partnership ("Birmingham"), Edwin Kronfeld, both individually and as surviving general part-ner of Birmingham ("Kronfeld"), and the First National Bank and Trust Company of Tulsa, Oklahoma, as successor personal representatives of the estate of F. Paul Thieman, deceased (we refer herein only to "Thieman"). Maritan apparently lost all or most of $482,591.80 in an unsuccessful project for the construction and sale of five expensive homes and the remodeling and sale of a sixth home, all on a single piece of property, subdivided into six lots. Maritan's involvement was solicited by Thieman on behalf of Birmingham. The core question is whether Maritan's interest in the project is a security, as defined in the federal securities laws, by virtue of being an "investment contract." Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1). The district court ruled that Maritan's involvement with Birmingham was not an investment contract. It found, among other things, that Maritan "exercised considerable control and influence over the joint venture and closely monitored his investment and cannot now be heard to maintain that he was merely a passive investor."

On appeal Maritan essentially repeats the arguments he raised below, and he contends that summary judgment was improper because when "[v]iewed in a light most favorable to Maritan, the evidence is clearly sufficient to create a triable issue of fact" on the controlling test for determining the existence of an investment contract. In this regard he alleges that the district court disregarded evidence and improperly evaluated other evidence. Maritan also contends that the district court erred "in failing to exercise pendent jurisdiction over Maritan's state law claims." We affirm substantially for the reasons contained in the district court's careful opinion.

Maritan does not dispute the following facts. Thieman and Kronfeld were both attorneys and partners in the practice of law in Tulsa, Oklahoma in 1980. They formed Birmingham, a general partnership. On January 26, 1981 Birmingham acquired the "Brazier Estate" in Tulsa for the purpose of subdividing it into twelve residential lots, remodeling and selling the existing house on one lot, and building and

selling homes on the other eleven lots. Due to neighborhood resistance the project was eventually redesigned for six lots. Initial financing was obtained by borrowing $425,000 from the Bank of Oklahoma, secured by a mortgage on the property. On December 15, 1981 H.A. Reaves, a longtime friend of Thieman invested $100,000 in the project. For tax purposes he was listed for 1981 as a general partner of Birmingham, but thereafter as a limited partner. Birmingham was formally converted to a limited partnership in 1982, with Thieman and Kronfeld as general partners and Reaves as the sole limited partner.

The project became short of funds and in June, 1982 Thieman approached Maritan and solicited his involvement. Thieman and Maritan had been friends for more than twenty years. Thieman had also done and was doing legal work for Maritan, and they had participated in other business ventures together. Maritan was a successful businessman, president and majority shareholder of Western Petroleum Company, Inc.

Thieman proposed that Maritan become involved immediately with just two of the lots. The house to be remodeled and sold was on one, and a new house would be constructed for sale on the other. Maritan also would have the option to participate in developing the remaining four lots. Within a few days after Thieman's meeting with Maritan, Thieman mailed him a letter containing the terms of their agreement. Since those terms are crucial to the case, we set them out in full:

BIRMINGHAM PROPERTIES

1818 One Williams Center

Tulsa, Oklahoma 74172

July 2, 1982

Mr. Gene Maritan

3105 East Skelly Drive

Suite 615

Tulsa, OK 74105

Re: Block 1, Birmingham Circle Addition

Dear Gene:

If this letter correctly sets forth our agreement as to the above-captioned land and improvements thereon (the "Property"), please indicate your acceptance in the place indicated below.

1. You are to purchase Lots 1 and 2 of the Property for $235,000: $200,000 on July 5, 1982 and $35,000 within thirty (30) days.

2. We are to jointly remodel the house on Lot 2 and construct a new house on Lot 1 as follows:

a. You and Birmingham Properties, an Oklahoma Limited Partnership ("Birmingham"), will each pay for fifty percent (50%) of the cost of such remodeling and new construction which shall include landscaping, architectural expense, contractor's and owner's representative fees as well as sales expenses; the details of which will be the sole responsibility of Birmingham.

b. The sales proceeds, less expenses, will be divided as follows and in the following order:

(i) to you in an amount equal to all your cash outlay for paragraphs 1 and 2(a) above;

(ii) To you in an amount sufficient to provide a twenty-five percent (25%) return, on an annualized basis, on your paragraphs 1 and 2(a) cash outlays;

(iii) To Birmingham in an amount equal to its cash outlays for paragraph 2(a) above;

(iv) To Birmingham in an amount sufficient to provide a twenty-five percent (25%) return, on an annualized basis, on its paragraph 2(a) cash outlays.

(v) The balance, if any, to you and Birmingham equally.

3. Birmingham, in its sole discretion, will construct new houses on Lots 3, 4, 5 and 6. You have six months from the date of this letter to elect to participate in said construction and sale on the following terms and conditions, including paragraphs 4, 5 and 6:

a. You and Birmingham will each pay for fifty percent (50%) of the cost of such construction which shall in-

clude landscaping, architectural expense, contractor's and owner's representatives fees, as well as sales expenses, the details of which will be the sole responsibility of Birmingham.

b. The sales proceeds from such Lots 3, 4, 5 and 6 and the houses to be constructed thereon will be divided on a house by house basis, as follows and in the following order:

(i) To Birmingham in an amount equal to its cash outlays for paragraph 3(a) above and $85,000 as to each lot;

(ii) To Birmingham in an amount sufficient to provide a twenty-five percent (25%) return on an annualized basis on its paragraph 3(a) cash outlays and on $85,000 as to each lot, the return as to such lot price to be deemed to run from July 1, 1982;

(iii) To you in an amount equal to your cash outlays for paragraph 3(a) above;

(iv) To you in an amount sufficient to provide a twenty-five percent (25%) return, on an annualized basis on your paragraph 3(a) cash outlays;

(v) The balance, if any, twenty-five percent (25%) to you and seventy-five percent (75%) to Birmingham.

4. Birmingham is to provide and pay for adequate public streets, sewer (storm and sanitary) and water to serve the Property. Birmingham shall supervise the provision of telephone, electric or gas utilities to the Property.

5. The sales of the properties will be the sole discretion of Birmingham.

6. Birmingham is to be paid no fees or compensation, except as expressly contemplated hereby, except out-of-pocket expenses and bookkeeping charges at $28.00 an hour based on actual time spent.

Sincerely yours,
Birmingham Properties
By: /s/ F. Paul Thieman
    a General Partner
Date: 7-2-82

Agreed:
/s/ GM in WEPCO
Gene Maritan

Date: 7-6-82
R.Vol. I, doc. 1, Ex. A.

Because of continuing financial difficulties on the project the agreement was modified in 1984, at Maritan's suggestion, to reallocate the division of proceeds from the sale of the houses. The revised agreement states:

THIEMAN & KRONFELD

COUNSELORS AT LAW

1818 ONE WILLIAMS CENTER

TULSA, OKLAHOMA 74172

Telephone (918) 585-5955

January 10, 1984

Mr. Gene Maritan, President
Western Petroleum Co., Inc.
3105 East Skelly Drive
Suite 615
Tulsa, Oklahoma 74105

Re: Block 1, Birmingham Circle Addition to the City of Tulsa

Dear Gene:

If this letter correctly sets our agreement modifying and overriding paragraphs 2 and 3 of our agreement of July 2, 1982 as to the above-described land and improvements thereon (the "Property"), please indicate your acceptance in the place indicated below. You have previously elected to participate in the construction, if any, and sale of lots 3, 4, 5 and 6.

1. You are to pay your fifty percent (50%) share of the costs incurred in the construction of improvements, including utilities, Lots 1-6 (principally Lots 1 and 2) from June 1 through November 30, 1983 in the amount of $96,-553.48 and $4,040.32 of interest paid for your account. You agree to pay fifty percent (50%) of additional costs as bills are received.

2. Birmingham, in its sole discretion, will design and build or cause to be built new houses on Lots 3, 4, 5 and 6. You and Birmingham will each pay for fifty percent (50%) of the cost of such

construction which shall include without limitation, landscaping, architectural and engineering services, contractor's fees and sale expenses. The management and supervision of such construction will be the responsibility of Birmingham.

3. The net proceeds of sales are to be divided as follows:

a. Lot 1 and the improvements thereon. You are to receive the first $85,000 and one-half (½) of the balance. Birmingham is to receive one-half (½) of such balance.

b. Lot 2 and the improvements thereon. You are to receive the first $150,000 and one-half (½) of the balance and Birmingham is to receive one-half (½) of such balance.

c. Sale of any of Lots 3 through 6 unimproved. For these purposes the fence and landscaping on Lot 6 is not deemed an improvement. As to each lot, Birmingham is to receive the first $85,000 and one-half (½) of the balance and you are to receive one-half (½) of such balance.

d. Sale of any of Lots 3 through 6 improved. As to each lot, Birmingham is to receive the first $85,000 and one-half (½) of the balance and you are to received [sic] one-half (½) of such balance.

Yours truly,
BIRMINGHAM PROPERTIES
By: /s/ F. Paul Thieman
A General Partner

Agreed:

/s/ Gene Maritan
Gene Maritan

Date: 1–31–84

R.Vol. I, doc. 1, Ex. B.

Consistent with the terms of his agreement with Birmingham, Maritan paid $200,000 immediately and $35,000 on August 25, 1982. Birmingham sent Maritan monthly statements reflecting expenses incurred during the previous month in remodeling the old house and constructing the new house, and invoicing him for one-half the amount. After review by his accountant, Maritan approved the invoiced amounts and paid Birmingham, which paid the expenses. At Maritan's request this process was suspended for one six-month period, then resumed, with Maritan paying his share of expenses incurred in the interim.

Maritan did not take title to lots 1 and 2 of the project, and title remained in Birmingham. Thieman did not tell Maritan that the lots were subject to a mortgage, or that the mortgage debt was increased to $600,000 in August 1983. Maritan did not discover those facts until 1985, just prior to the sale of the remodeled house. Both the remodeled house and the new house were sold in 1985 with the entire net proceeds going to the bank as required under the terms of its loans secured by the mortgage on the property. Maritan received nothing.

The main theme of Maritan's argument is that he was a passive investor on this project, dependent upon the efforts of Birmingham for the success or failure of the enterprise. Unquestionably Maritan did not seek and was not expected to take an active part in the management of the project. The agreement specifically allocated that responsibility to Birmingham. However, in late 1983 circumstances changed. Thieman discovered he had cancer. He became increasingly incapacitated in 1984 and died on September 29, 1984. Thieman and Kronfeld had a falling out, dissolved their law partnership in the fall of 1983, and Kronfeld was removed from his active management of Birmingham until after Thieman's death.

As a result, in 1984 Maritan became more active, but the record also shows that he had always been involved to a degree. The district court summarized that involvement as follows:

"The plaintiff exercised his rights and exerted control over the venture in an number of ways: (1) plaintiff made monthly payments pursuant to the agreement after reviewing expenses (admitted by plaintiff); (2) plaintiff approved payments for work performed on the houses (*See* Affidavit of Essie Haugen at page 2, Exhibit to First National Bank's motion for summary judgment); (3) plaintiff showed the house to a real estate broker

for evaluation (*See* Affidavit of Gene Maritan at page 3, and Deposition of W.E. Freeman at page 38); (4) the plaintiff negotiated and participated in setting the selling prices for the houses (*See* Defendant's Exhibit 22, letter to realtor from Gene Maritan); (5) plaintiff arranged for work to be performed on the various venture property (*See* Defendant's Exhibit 31, letter from W.E. Freeman to Joe H. Cline, and Deposition of W.E. Freeman at page 49); (6) plaintiff negotiated release of the insurance company from its liability after a fire on the subject property (Defendant's Exhibit 99, insurance policy release signed by plaintiff); (7) plaintiff accepted and negotiated an insurance draft on behalf of the joint venture for the payoff of a fire claim (Defendant's Exhibit 102, insurance check negotiated by plaintiff); and (8) plaintiff agreed and actively assumed responsibility for the projects after the death of the general partner, F. Paul Thieman (*See* Affidavit of Gene Maritan at page 4, Exhibit to Opposition to Motion for Summary Judgment. *See also,* Deposition of Edward Mysock at 57)."

R.Vol. I, doc. 81 at 5–6.

Except in a few instances Maritan does not seriously dispute those facts (e.g., he asserts that Thieman negotiated the insurance settlement). His argument is that they are taken out of context and given undue weight. He asserts that his "activity during this brief interval [immediately preceding and following Thieman's death] is inconsequential when compared to the extensive managerial role played by Kronfeld, and later Thieman, and when considered in the context of the overall sequence of events." Brief-in-Chief of the Appellant at 26. Maritan also heavily emphasizes Thieman's alleged expertise in real estate compared with Maritan's inexperience, and Thieman's position of trust, as an attorney, with Maritan to show Maritan's dependence upon Thieman and Kronfeld for protection and for the success of the venture.

The general legal principles applicable to this case were articulated by the district court as follows:

"In *S.E.C. v. Howey Co.,* 328 U.S. 293, 301 [66 S.Ct. 1100, 1104, 90 L.Ed. 1244] (1946), the Supreme Court held that the test for distinguishing an investment contract from other commercial dealings 'is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' The test has subsequently been broken down into three requirements: '(1) An investment, (2) in a common enterprise, (3) with "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." ' *Crawford (sic) [Crowley] v. Montgomery Ward & Co.,* 570 F.2d 877, 880 (10th Cir.1978), quoting *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852 [95 S.Ct. 2051, 2060, 44 L.Ed.2d 621] (1975)."

R.Vol. I, doc. 81 at 4.

It is also established law in this circuit that:

"Whether a particular investment constitutes a security depends upon the facts and circumstances of the case. *See, e.g., ... S.E.C. v. Howey Co., supra.* Substance is exalted over form and emphasis is placed on economic reality. *See, e.g., Continental Marketing Corp. v. Securities & Exchange Com'n,* 387 F.2d 466, 470 (10th Cir.1967)."

*Vincent v. Moench,* 473 F.2d 430, 435 (10th Cir.1973). *See also McGill v. American Land & Exploration Co.,* 776 F.2d 923, 925 (10th Cir.1985); *Woodward v. Terracor,* 574 F.2d 1023, 1024 (10th Cir.1978); *McGovern Plaza Joint Venture v. First of Denver,* 562 F.2d 645, 647 (10th Cir.1977); *Ballard & Cordell Corp. v. Zoller & Danneberg, Ltd.,* 544 F.2d 1059, 1063 (10th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977); and *Continental Marketing Corp. v. Securities & Exchange Comm'n,* 387 F.2d 466, 470 (10th Cir.1967), *cert. denied,* 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968).

Maritan does not directly attack these legal standards, but he does attempt to confine the legal analysis to our recent restatement of the rule that the reliance

element inherent in the third prong of the *Howey* test is met when " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " *Meyer v. Dans un Jardin, S.A.,* 816 F.2d 533, 535 (10th Cir.1987), citing *Crowley v. Montgomery Ward & Co.,* 570 F.2d 875, 877 (10th Cir.1975) (*Crowley I*) (quoting *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973)).

It is Maritan's view that there is at least a fact issue as to whether the efforts of Birmingham were the undeniably significant ones, the essential managerial efforts which affected the success or failure of Birmingham. Thus, his approach to the case focuses mainly on the distribution and exercise of managerial responsibility for this project. However, the language from *Meyer v. Dans un Jardin* upon which Maritan relies is a general, not an exclusive statement. It does not stand for the proposition that in every fact situation, the sole test in this circuit is whose efforts actually affected the success or failure of the enterprise. For example, in *Ballard & Cordell Corp. v. Zoller & Danneberg, Ltd.,* 544 F.2d at 1065, we stated that the proper inquiry there included an examination of the investor's powers under the terms of the agreement, the information available to and the sophistication of the investor, adequacy of financing, degree of speculation, whether or not the risks involved were normal business risks, and so on. *See Crowley v. Montgomery Ward & Co., Inc.,* 570 F.2d 877, 880 (10th Cir.1978) (Crowley II) ("The contribution of time and effort is only part of the test. Consideration must be given to control over the factors essential to the success of the enterprise."); *Vincent v. Moench,* 473 F.2d at 436 ("If the resulting relationship was a continuing common enterprise in which the plaintiffs had no control or *right of control....*") (emphasis added); *Mr. Steak, Inc. v. River City Steak, Inc.,* 460 F.2d 666 (10th Cir. 1972). *See also Marine Bank v. Weaver,* 455 U.S. 551, 560, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982) ("[T]he provision that the Weavers could veto future loans gave them a *measure of control* over the operation of the slaughterhouse *not characteristic of a security.*") (emphasis added). In short, each case must be analyzed on its own facts, keeping in mind that "Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial world, ..." *Marine Bank* at 559, 102 S.Ct. at 1225.

We agree with the district court's broader analysis in this case. And recent decisions by the Fourth and Ninth Circuits, while not directly on point factually, provide helpful guidance consistent with the law in our circuit. *See Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236 (4th Cir.1988); *Matek v. Murat,* 862 F.2d 720 (9th Cir.1988). Both cases involved general partnerships where management responsibility was delegated and some general partners performed no discernible active role. In *Matek* the Ninth Circuit stated that the focus should not be "too much on participation in management rather than on access to information about the investment." *Matek,* 862 F.2d at 728. The court went on to say:

"The principal purpose of the securities acts is to protect investors by promoting full disclosure of information necessary to informed investment decisions. *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963); *A.C. Frost & Co. v. Coeur D'Alene Mines Corp.,* 312 U.S. 38, 40, 61 S.Ct. 414, 415, 85 L.Ed. 500 (1941); *Amfac Mortgage Corp. v. Arizona Mall of Tempe,* 583 F.2d 426, 432–33 (9th Cir.1978). Therefore, access to information about the investment, and not managerial control, is the most significant factor.... We *must focus on the 'economic realities'* of this particular transaction to determine whether these investors are in need of the protections of the securities act. *See [SEC v.] Ralston Purina,* 346 U.S. [119] at 125–26, 73 S.Ct. [981] at 984–85 [97 L.Ed. 1494 1953]."

*Id.* The court then pinpointed the powers found in the contract between the parties as the proper focal point, rather than actual participation. Properly construing and then agreeing with the law in this circuit, the court stated:

> "The Tenth and the Eighth Circuits follow the principle that regardless of the control actually exercised, if the partnership contract retains real power in the partners, then the investments are not securities.
>
> . . . .
>
> 'Even when general partners do not individually have decisive control over major decisions, they do have the sort of influence which generally provides them with access to important information and protection against a dependence on others. . . . The managerial powers and the right of inspection vested in general partners therefore takes them outside the intended scope of federal securities law [quoting *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 650 F.Supp. 1378, 1383–84 (W.D.Va.1986) ].'
>
> "We agree with the Tenth and Eight Circuits that the *proper focus of the examination must be the contract.*"

*Matek* at 729, 730 (emphasis added) (citations omitted).

Applying those rules, the Ninth Circuit found that the interests in question were not investment contracts because the terms of the governing agreement created powers and duties not typical of the passive investor in a security. The participants had sufficient power to protect their investments, and had access to necessary information about the business. *Matek* at 731. A similar theme is expressed by the Fourth Circuit in *Rivanna Trawlers.*

As previously noted, *Matek* and *Rivanna Trawlers* both involved general partnerships. In this case there is a dispute as to the nature of the arrangement between Maritan and Birmingham. The appellees insist it was a joint venture, giving Maritan all the powers and protections afforded such status under Oklahoma law. Maritan has taken the awkward position of disavowing his own complaint which flatly acknowledges the arrangement to be a joint venture. The technical points of law he now raises, however, do not alter the fact that, as his complaint shows, he considered his role to be that of a joint venturer, a view with which his attorney obviously agreed at the outset of this case.

Regardless, we do not find it necessary to label the relationship, or to rely on the specific Oklahoma laws urged upon us by the appellees. It is sufficient for our analysis to focus, among other things, on the power which Maritan had under the agreement when it was signed.

As the district court noted, the agreement unambiguously provided that Maritan was to purchase lots 1 and 2. Whether or not he formally followed through and took title is not controlling. Doubtless, as Maritan strongly argues, he took a relaxed approach to the transaction because of his close and long-standing relationship with Thieman. But that does not avoid the fact that he had the *power* under the agreement to take title to the property and thus control the ultimate outcome of the transaction. Taking title would not only undoubtedly have disclosed the existing mortgage, permitting Maritan to alter the terms or drop the deal, it would have placed Maritan in a position of absolute control over further bank financing and necessarily inserted him into the process of selling the houses at least on lots 1 and 2.

The agreement imposed on Maritan an ongoing duty to pay for one-half of the costs, which he did in general on a monthly basis following receipt of a list of expenses. That gave him an absolute power of access to vital information. And, although not decisive in our disposition, the duty to pay for one-half of the costs seems implicitly to have conferred a corresponding power to consult, disapprove, and otherwise participate in the ongoing development of the project. For instance, he could have withheld payment at any time on the ground that an improper expense was not the type of cost contemplated by the agreement.

Maritan insists that his various admitted activities in regard to the project are insig-

nificant when compared to Birmingham's activities and, in any event, are irrelevant because most of them took place two years after the agreement was signed. However, we first view their significance qualitatively, not quantitatively. That is, the fact and nature of Maritan's later participation sheds light on how the parties regarded Maritan's rights and status under the agreement all along. When difficulties arose it was not Reaves, the limited partner of Birmingham, to whom everyone turned and who assumed active responsibility, it was Maritan. The record does not show that Maritan was in the least surprised or dissatisfied with the assumption of a more active role, or that such a role was in his or anyone else's mind inconsistent with his rights under the agreement. The district court made that point with the following quote from *Slevin v. Pedersen Associates, Inc.*, 540 F.Supp. 437, 441 (S.D.N.Y.1982):

> "[I]ntent becomes clear from the relationship which the parties accepted thereafter. The plaintiff felt free to work directly on the venture. When plaintiff thought that the venture was not moving along at a proper rate, he rendered his services freely—whether the services be ministerial [or managerial] does not matter—his accepted ready access to the business venture shows that he was not a passive investor."

R. Vol. I, doc. 81 at 8–9.

We do not discount the quantitative aspect of Maritan's activities. While comparatively small, they were not in and of themselves insignificant as Maritan contends. They clearly place Maritan in an authoritative role. More to the point, they were not consistent with Maritan's claimed status as a mere passive and helpless investor.

Finally, Maritan's undisputed access to full and complete information must be taken into account. He was not told about the mortgage on the property, but he surely was not prevented from finding out. He could have, but failed to take title to the property, which would have revealed that information. He saw and essentially approved (by payment) the monthly expenses. His relationship with Thieman was close, ongoing, and of such a nature that his access to the books and records of the business, when and if requested, cannot be doubted.

In sum, this transaction does not describe that which the federal securities laws were designed to protect.[1] The numerous cases cited to us by Maritan do not compel a different conclusion. They are easily distinguishable on their facts. When this transaction is correctly analyzed by focusing on Maritan's access to information, then on the agreement and Maritan's express and implied rights and powers under the agreement, all as confirmed by his subsequent actions, we are satisfied that no genuine issue of material fact remains for trial.[2] Whether or not exercised, Maritan's access to critical information about the venture, his power under the agreement, and his demonstrated active involvement gave him sufficient control over the ultimate expectation of profits so that the third prong of the *Howey* test, as defined in this circuit, is inapplicable as a matter of law. Failing that essential element, Maritan's interest cannot be defined as an "investment contract" under the federal securities laws. This "agreement between [Maritan and Birmingham] is not the type of instrument that comes to mind when the term 'security' is used and does not fall within 'the ordinary concept of a security.'" *Marine Bank v. Weaver*, 455 U.S. at 559, 102 S.Ct. at 1225. Accordingly, we hold that this unique agreement is not a security. *See Marine Bank* at 560, 102 S.Ct. at 1225.

We are bound on appeal by the same strictures as are imposed on the district court for granting summary judgment. The district court correctly articulated those rules and we need not repeat them

---

1. That does not in the slightest foreclose causes of action which may be available under state law. We simply express no opinion on the point.

2. We reject the argument that the district court was precluded from entering summary judgment by virtue of its earlier ruling which stated that genuine issues of material fact remained, and identifying three. District courts are always free to reconsider interlocutory rulings.

here. We add, however, that the mere existence of *some* alleged factual dispute will not defeat an otherwise proper motion for summary judgment. Where the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Finally, we reject Maritan's contention that the district court erred in dismissing his pendent state claims. Such dismissals are within the discretion of the district court, and absent abuse of that discretion we will not reverse. Particularly where the federal claims are dismissed before trial for the reasons described here, it is not an abuse of discretion to dismiss the state claims as well. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Central Nat'l Bank v. Rainbolt,* 720 F.2d 1183, 1187 (10th Cir.1983).

We have considered all of the arguments and authorities presented, addressing those we deemed necessary. For the reasons stated above, the judgment of the district court is AFFIRMED.