**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 24, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff-Appellant,

v.

JEFFORY D. SHIELDS, a/k/a Jeffrey
D. Shields; GEODYNAMICS, INC.,
f/k/a or d/b/a Geodynamics
Exploration, Inc.,

     Defendants-Appellees,

and

GEODYNAMICS, INC.
JOHNSTON'S CORNER #1 AND #2
JOINT VENTURE; GEODYNAMICS,
INC. HUSKIES #1 JOINT VENTURE;
GEODYNAMICS EXPLORATION,
INC. TRUMPETER #1 AND #2
JOINT VENTURE; GEODYNAMICS,
INC. EVDA #1 JOINT VENTURE;
FLORIBAMA OIL CORPORATION;
CARBOTEC, INC.; TRITON
ENERGY ASSET MANAGEMENT,
INC., d/b/a Triton Energy Asset
Management, LLC; GEODYNAMICS
PROPERTY MANAGEMENT, LLC;
T.E.A.M. PROPERTY
MANAGEMENT, LLC, d/b/a
T.E.A.M. Property Management;

No. 12-1438

S & P ENERGY, LLC; AURUM
ENERGY ASSOCIATES, LLC;
UNUM, LLC,

      Relief Defendants-Appellees.
_____

THE AMERICAN ENERGY JOINT
VENTURE ASSOCIATION,

      Amicus Curiae.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:11-CV-02121-REB-MJW)**

---

Susan S. McDonald, Senior Litigation Counsel (Anne K. Small, General Counsel; Michael A. Conley, Deputy General Counsel; Jacob H. Stillman, Solicitor; and Benjamin Vetter, Attorney, with her on the briefs), of the Securities and Exchange Commission, Washington, D.C., for Plaintiff-Appellant.

Paul H. Schwartz (Andrew R. Shoemaker and Alice Warren-Gregory, with him on the brief) of Shoemaker Ghiselli & Schwartrz LLC, Boulder, Colorado, for Amicus Curiae in support of Appellees.

---

Before **BRISCOE**, Chief Judge, **SEYMOUR**, and **LUCERO,** Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

    The Securities and Exchange Commission ("SEC") brought this civil enforcement action against Defendant-Appellees Jeffory D. Shields, GeoDynamics, Inc. ("GeoDynamics"), and several other business entities

-2-

affiliated with Mr. Shields, alleging securities fraud in connection with four oil and gas exploration and drilling ventures Mr. Shields, as managing partner of GeoDynamics, marketed to thousands of investors nationwide as Joint Venture Agreements ("JVAs"). The district court granted defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss. The SEC appeals, contending that despite their labels as JVAs, the investment agreements are actually "investment contracts" and thus "securities" subject to federal securities regulations as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934 (collectively, the "Securities Acts"). Because it cannot be said as a matter of law that the investments at issue are not "investment contracts," we reverse.

# I

"In a securities case, we may consider, in addition to the complaint, documents incorporated by reference into the complaint, public documents filed with the SEC, and documents the plaintiffs relied upon in bringing suit." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013); *see also Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) (on review from grant of 12(b)(6) motion, court may consider documents referred to in complaint that are "central to [the plaintiff's] claim"). The following facts are taken from the factual allegations in the SEC's complaint together with the offering documents central to this case.

Mr. Shields is a resident of Larkspur, Colorado.[1]  In September 2009, he formed GeoDynamics, a Colorado corporation with its principal place of business in Centennial, Colorado.  According to the SEC, in order to fund GeoDynamics, Mr. Shields initially obtained money by offering and selling more than five million dollars worth of interests in four purported oil and gas exploration and drilling joint ventures to sixty investors across twenty-eight states.  Four of these joint ventures are at issue in this case, including: Johnston's Corner, created in January 2010 and sold by GeoDynamics as Johnston Corner #1 and #2 Joint Venture; Huskies, created in April 2010 and sold by GeoDynamics as Huskies #1 Joint Venture; Trumpeter, created in August 2010 and sold by GeoDynamics as Trumpeter #1 and #2 Joint Venture; and EVDA, created in May 2011 and sold as EVDA #1 Joint Venture.[2]

---

[1] Mr. Shields has had prior dealings in the oil and gas industry, including involvement with one company that was sued for fraud by the State of Colorado. He also has a felony record and is currently incarcerated at the Douglas County Detention Facility in Colorado.  Mr. Shields is proceeding pro se.  He did not file a brief but instead filed a letter joining in the amicus brief filed by the American Energy Joint Venture Association in opposition to the SEC's opening brief.

[2] In its complaint, the SEC alleges that in addition to forming and controlling GeoDynamics and the four purported joint ventures at issue in this case, Mr. Shields "formed and/or controls" eight other "corporate entities to create the illusion that various functions were segregated and/or managed by others."  Aplt. App. at 19-20 ¶ 27.  These companies include: Huskies Leasehold Joint Venture, a purported joint venture with its principal place of business in Centennial, Colorado; Floribama Oil Corporation, a Florida corporation with its principal place of business in Pensacola, Florida; Carbotec, Inc., a Colorado corporation with its principal place of business in Centennial, Colorado; Triton

(continued...)

-4-

Mr. Shields' sales strategy included marketing these oil and gas exploration and drilling ventures by making nationwide cold calls to thousands of members of the general public and promising investors annual returns between 256% and 548%. According to the SEC's investigation, Mr. Shields initially solicited investors by making cold calls himself. By 2010, however, he had hired and was supervising more than a dozen salespersons, each making over 400 boiler room cold calls a day to potential investors. As a result of this sales strategy, investors were spread out across the entire country and had no prior relationship or contact with each other.

Mr. Shields, as managing partner of GeoDynamics, specifically marketed these investments to members of the general public with little or no experience in the oil and gas exploration business. During these sales pitches, the SEC contends, Mr. Shields and his staff would specifically emphasize "the capabilities

[2](...continued)
Energy Asset Management, Inc., a Nevada corporation with its principal place of business in Centennial, Colorado; T.E.A.M. Property Management, LLC, a Colorado limited liability company with its principal place of business in Centennial, Colorado; S & P Energy, LLC, a Colorado limited liability company with its principal place of business in Centennial, Colorado; Aurum Energy Associates, LLC, a Colorado limited liability company with its principal place of business in Centennial, Colorado; and Unum, LLC, a Colorado limited liability company with its principal place of business in Centennial, Colorado. The SEC initially filed suit against Mr. Shields, GeoDynamics, the four joint venture interests at issue in this appeal, and the above mentioned companies. It asserts in its opening brief that these companies are all "relief" defendants "because they may hold assets belonging to investors." Aplt. Br. at 4 n.2; *see SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991).

and unique qualifications of GeoDynamics as an experienced oil and gas driller and operator." Aplt. App. at 34-35 ¶ 83. If an investor seemed interested after the pitch, Mr. Shields would send the investor a packet of offering documents which included: Confidential Information Memoranda ("CIMs"), which explained how the venture would operate; one or more of the JVAs; and a Monthly Income Conversion Table that outlined the expected annualized profits for each purported joint venture.[3]

The offering documents state "the Venturers will have all of the rights and will be subject to all of the liabilities of a General Partner under" Texas law, *id.* at 104, and also note that GeoDynamics, as managing venturer, "takes the position that the joint venture interest are not securities," *id.* at 19 ¶ 26. Under the agreements, investors "expressly delegate[d] management of the day-to-day Operations of the Joint Venture[s]" to GeoDynamics as managing venturer. *Id.* at 73 ¶ 4.1. GeoDynamics had broad powers to bind the joint ventures by executing agreements and contracts on their behalf and spending funds raised, and had exclusive power to interpret ambiguous provisions of the JVAs. Notably, no investor had any power to bind the joint ventures.

Investors did have the right to vote on certain matters, including the right to

---

[3] The documents for each are essentially identical with only minor differences, such as the price of the joint venture units for sale, the expected profit for each venture, and the location of the oil wells.

remove the managing venturer by a vote of 51% "in interest" of the venturers, *id.* at 77 ¶ 5.7, and the right to terminate the partnership. They also had the right to develop procedures for partnership meetings, amend the partnership agreements, and call partnership meetings. In addition, investors maintained the right to inspect the accounting records and reports which, under the JVAs, the managing venturer was required to provide to them, including annual reports concerning the status of each venture. But the SEC alleges that Mr. Shields denied investors access to information, including financial statements and reports for each joint venture, even when investors specifically requested the information. Moreover, the SEC alleges Mr. Shields consistently lied to investors on conference calls in an attempt to keep them misinformed, raise more money, and prevent them from challenging his actions.

When an investor purchased an interest in one of the four purported joint ventures, he or she would wire the funds or send a check to the GeoDynamics account associated with the joint venture interest purchased. The offering documents stated that funds raised for a specific venture would be deposited in a separate account for each respective venture, and also explained that investors' funds would be used to pay for the cost of drilling and completing the wells under the provisions of the "turnkey" contracts executed solely with GeoDynamics. Indeed, investors were required to enter into "turnkey" drilling and completion

contracts with GeoDynamics in order to invest in any one of the ventures.[4]  These provisions of the offering documents essentially locked investors into drilling and completion contracts exclusively with GeoDynamics, who unilaterally set the contract prices before an investor purchased an interest in the venture.

Notwithstanding the terms of the agreements, the SEC alleges that Mr. Shields and GeoDynamics commingled all funds raised through investors and deposited the money directly into accounts controlled by Mr. Shields. GeoDynamics' Chief Financial Officer "admitted in testimony during the SEC's investigation that there were no internal controls in place, and that she made no effort to segregate funds of the respective joint ventures.  Instead, at Shields' direction, GeoDynamics' CFO used funds from any available source to pay Shields' personal expenses, GeoDynamics' administrative expenses, and various operational expenses as they came due," Aplt. App. at 30 ¶ 73, regardless of whether they were related to the joint ventures.  In fact, of the roughly five million dollars raised from investors, over two million went directly to Mr.

---

[4] The JVAs define the "Turnkey Drilling Contract" as "the Agreement to be entered into by and between GeoDynamics and the Venture providing for the obligation of the Managing Venturer to bear the cost of drilling of the Prospect Well at a fixed price."  Aplt. App. at 69.  The "Turnkey Drilling Price" is defined as "the price to be paid by the Venture to GeoDynamics to perform the Turnkey Drilling Contract."  *Id.*  The "Turnkey Completion Contract" is defined as "the Agreement to be entered into by and between GeoDynamics and the Venture providing for the obligation of the Managing Venturer to bear the cost of Completion of the Prospect Well at a fixed price."  *Id.*  Finally, the "Turnkey Completion Price" is defined as "the price to be paid by the Venture to GeoDynamics to perform the Turnkey Completion Contract."  *Id.*

Shields to pay for extravagant personal expenses, luxury items, and cash withdrawals.[5]

Mr. Shields used an additional two million dollars of commingled investor funds for general business expenses, which vastly exceeded the amount the managing venturer was allowed to receive as monthly reimbursement under the offering documents. In all, of the roughly five million dollars raised by Mr. Shields and GeoDynamics, only $613,494 went to oil and gas development as of April 2011. In fact, GeoDynamics never finished the drilling work planned for in the offering materials, failed to produce any commercial quantities of oil or gas, and made no payments to investors involved in any of the four purported joint ventures. The SEC alleges Mr. Shields and GeoDynamics' fraud "is ongoing," and that they continued to raise funds for EVDA and "solicited investors for purported 'completion funds' for Trumpeter" and Huskies as recently as June 2011. Aplt. App. at 14 ¶ 6.

In September 2011, the SEC filed suit against Mr. Shields, GeoDynamics, the four joint ventures at interest in this appeal, and the relief defendants, alleging violations under several civil enforcement provisions of the Securities Acts,

---

[5] These expenditures included: $747,685 on a private Learjet; $236,444 on luxury automobiles; $31,537 on limousine and helicopter rentals; $200,206 on rent for multiple residences; $104,734 on sporting events; $26,434 on clothing and lingerie; $2,062 on jewelry; $68,223 on home furnishings; $14,987 on electronics; $39,205 on travel; and $467,129 to Mr. Shields via "cash withdrawals, checks, or transfers to his personal bank accounts." Aplt. App. at 25 ¶¶ 50-51.

including 15 U.S.C. §§ 77e(a), 77e(c), 77(q)(a), 78j(b), 78(o)(a), and Rule 10b-5. The SEC seeks, among other things, "preliminary and permanent injunctions, disgorgement plus-prejudgment and post-judgment interest, . . . an asset freeze, an accounting, and other relief," including recovery of all investor assets raised by Mr. Shields and GeoDynamics and transferred to relief defendants. Aplt. App. at 14 ¶ 7. Mr. Shields, GeoDynamics, the four joint venture interests at issue, and all relief defendants filed a Rule 12(b)(6) motion to dismiss the SEC's claims, which the district court granted without prejudice in favor of all defendants. The court held that the SEC's allegations were "insufficient to state a plausible claim that the joint venture interests at issue" were securities. Aplt. App. at 178.

The SEC timely filed this appeal. It contends the district court erred in granting the motion to dismiss, asserting that the investments Mr. Shields and GeoDynamics sold were "investment contracts" and therefore securities.

**II**

We review "the district court's dismissal under Rule 12(b)(6) de novo." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010). "We accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [SEC]." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). A pleading is required to contain "a short and plain statement of the claim showing

-10-

that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.")).

In *Khalik v. United Air Lines*, we explained that under *Iqbal* and *Twombly* "[a] plaintiff must 'nudge [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss." 671 F.3d 1188, 1190 (10th Cir. 2012) (alteration in original) (quoting *Twombly*, 550 U.S. at 570). We noted that "when legal conclusions are involved in the complaint 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions.'" *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 678). "Thus, mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). The complaint must set forth sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

-11-

*Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

We further explained in *Khalik* that

> [i]n applying this new, refined standard, we have held that plausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible.

671 F.3d at 1191 (internal quotation marks and citations omitted). Notably, in recognition that "[t]here is disagreement as to whether this new standard requires minimal change or whether it in fact requires a significantly heightened fact-pleading standard," we clarified:

> [T]he *Twombly/Iqbal* standard is a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do. In other words, Rule 8(a)(2) still lives. . . . [U]nder Rule 8, specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.

*Id.* at 1191-92 (internal quotation marks, citations, and alterations in original omitted).

We have stressed that the "nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming*, 656 F.3d at 1215. Making that determination "requires the reviewing court to draw on its judicial experience and common sense.'" *Burnett*, 706 F.3d at 1236 (quoting *Iqbal*, 556 U.S. at 679). Complaints which "do not allow for at least a

'reasonable inference' of the legally relevant facts are insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

We apply these principles to our review of the SEC's complaint to determine whether the district court erred in granting the motion to dismiss.

**III**

The central issue raised on appeal is whether the investments sold by Mr. Shields as managing partner of GeoDynamics are "investment contracts" and thus "securities" subject to federal securities regulations. To shed light on this question, we first examine the nature and purpose of the Securities Acts.[6]

Congress enacted the Securities Acts in response to "serious abuses in a largely unregulated securities market," and for the purpose of regulating "*investments*, in whatever form they are made and by whatever name they are called." *Reves*, 494 U.S. at 60-61. Congress "painted with a broad brush" in defining a "security" in recognition of the "virtually limitless scope of human

---

[6] The Supreme Court has consistently held that § 2(a)(1) of the 1933 Act, 15 U.S.C. § 77b(a)(1), and § 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), while having "slightly different formulations," are "treated as essentially identical in meaning . . . ." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (citing *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990)); *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847 & n.12 (1975) ("[T]he coverage of the two Acts may be considered the same."); *SEC v. Thompson*, 732 F.3d 1151, 1158 n.5 (10th Cir. 2013) ("The Supreme Court has repeatedly ruled that the definitions of 'security' in § 3(a)(10) of the 1934 Act and § 2(1) of the 1933 Act are virtually identical, and should be treated as such in decisions dealing with the scope of the term." (internal quotation marks and citation omitted)).

ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits . . . .'" *Id.* (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)).

To that end, as the Court explained, Congress "determined that the best way to achieve its goal of protecting investors was to define the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." *Id.* at 61 (internal quotation marks and citations omitted). In furtherance of that goal, Congress "did not attempt precisely to cabin the scope of the Securities Acts," but instead "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Id.* Accordingly, § 2(1) of the 1933 Act broadly defines the term security as:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

48 Stat. 74 (codified as amended at 15 U.S.C. § 77b(a)(1)) (emphasis added).

The Supreme Court has further explained that "the coverage of the antifraud provisions of the securities laws is not limited to instruments traded at securities exchanges and over-the-counter markets, but extends to uncommon and irregular instruments." *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982).  The Court has "repeatedly held that the test is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Id.* (internal quotation marks and citations omitted).  But the Court has cautioned that "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." *Id.* at 556.  Thus, the "task has fallen to the [SEC] . . . and ultimately to the federal courts to decide which of the myriad financial transactions in our society come within the coverage of the [Securities Acts]." *Reves*, 494 U.S. at 61 (quoting *Forman*, 421 U.S. at 848) (internal quotation marks omitted).

Although the Securities Acts broadly define a security, neither act specifically defines an "investment contract." *Edwards*, 540 U.S. at 393.  The Supreme Court first confronted this question in *SEC v. W.J. Howey Co.*, where it stated that the "test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301.[7]  The test "embodies a flexible rather than static principle, one that is

---

[7] In order to distinguish "an investment contract from other commercial dealings," the *Howey* "test has subsequently been broken down into three

(continued...)

capable of adaptation to meet the countless and variable schemes devised by those

who seek the use of the money of others on the promise of profits." *Id.* at 299.

Building on *Howey*, the Court in *Forman* added:

> This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. *The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.*

421 U.S. at 852 (emphasis added).

Importantly, the Court has expressly stated that in assessing whether an

investment scheme is an investment contract, "form should be disregarded for

substance," *id.* at 848 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)

(internal quotation marks omitted)), and courts should focus on the "economic

realities underlying a transaction, and not on the name appended thereto," *id.* at

849. We recently reiterated that courts should take this approach in order "to

capture and effectuate the regulation of '*investments*, in whatever form they are

made and by whatever name they are called.'" *Thompson*, 732 F.3d at 1158

(quoting *Reves*, 494 U.S. at 61); *see also Maritan v. Birmingham Props.*, 875 F.2d

1451, 1456 (10th Cir. 1989); *Woodward v. Terracor*, 574 F.2d 1023, 1024 (10th

---

[7](...continued)
requirements: (1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Banghart v. Hollywood Gen. P'ship*, 902 F.2d 805, 807 (10th Cir. 1990) (citing *Crowley v. Montgomery Ward & Co., Inc.*, 570 F.2d 877, 880 (10th Cir. 1978) (*Crowley II*)).

Cir. 1978); *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981).

Neither party disputes that the first two elements of the *Howey* test are satisfied—that is, investors gave money directly to Mr. Shields and GeoDynamics as part of a common investment scheme. Instead, the parties confine their central argument to the third prong of the *Howey* test: whether the investment was "premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852.

The joint venture agreements here are denominated general partnerships and our circuit applies a "strong presumption that an interest in a general partnership is not a security," mainly "because the partners-the investors-are ordinarily granted significant control over the enterprise." *Banghart*, 902 F.2d at 807-08.[8] Presented with this presumption, the SEC argues that we should adopt

---

[8] The SEC contends we should not apply the presumption that general partnership agreements are not investment contracts and thus not securities because to do so disregards the Supreme Court's substance over form principle and "provides an unwarranted advantage in SEC enforcement actions to unscrupulous promoters who sell investments with a veneer of partnership structure to inexperienced and unknowledgeable investors on the promise of profits." Aplt. Br. at 27. However, one panel of this court is not at liberty to overturn prior opinions of another panel. *United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000). Moreover, other circuits addressing this issue agree with us that this presumption is appropriate. *See, e.g.*, *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007) ("A general partnership interest is presumed not to be an investment contract because a general partner typically takes an active part in managing the business and therefore does not rely solely on the efforts of others." (citing *Williamson*, 645 F.2d at 422)); *Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988) ("General Partnerships ordinarily are not considered investment contracts because they grant
(continued...)

the Fifth Circuit's approach in *Williamson v. Tucker*, which discussed the types of allegations that can rebut the presumption, 645 F.2d at 424, and then apply the *Williamson* factors in evaluating whether the investors here expected profits produced solely from the efforts of others. The SEC further contends the district court erred in granting the motion to dismiss because the allegations in the complaint are sufficient to rebut the presumption.

The plaintiffs in *Banghart* principally relied on *Williamson*. We noted that the court there "set forth three examples of when a general partnership interest can be a security":

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manger of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Banghart*, 902 F.2d at 807 (quoting *Williamson*, 645 F.2d at 424). Nevertheless, we found it unnecessary to apply *Williamson*. We noted that our "decision in

_____

[8](...continued)
partners-the investors-control over significant decisions of the enterprise." (citations omitted)); *Youmans v. Simon*, 791 F.2d 341, 346 (5th Cir. 1986) ("[F]ederal security laws are usually held not generally to apply to general partners . . . [because] they are entrepreneurs, not investors, and have the ability to take care of their own interests because of the inherent powers available to them."); *Goodwin v. Elkins & Co.*, 730 F.2d 99, 102-03 (3rd Cir. 1984) (same); *Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir. 1983) (same). The Supreme Court has not held otherwise.

*Maritan v. Birmingham Properties*, while not directly on point factually, clearly indicates that our primary inquiry in the partnership setting is . . . on the *powers* possessed by the partners." *Banghart*, 902 F.2d at 807-08 (emphasis in original) (citation omitted). We explained:

> In *Maritan*, we approved the analysis set forth in *Matek v. Murat*, 862 F.2d 720, 730-32 (9th Cir. 1988) and *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 241 (4th Cir. 1988), where the courts held that regardless of the control actually exercised, if a partnership agreement retains real power in the general partners, then an investment in the general partnership is not a security.

*Id.* at 808. We therefore held that "[w]hen a partnership agreement allocates powers to general partners that are specific and unambiguous and those powers provide the general partners with access to information and the ability to protect their investment, then the presumption is that the general partnership is not a security." *Id.* (citing *Matek*, 862 F.2d at 731; *Rivanna*, 840 F.2d at 241).

But presumptions are not per se rules, and we recognized in *Banghart* that the presumption can be rebutted "by evidence that the general partners were rendered passive investors because they were somehow precluded from exercising their powers of control and supervision." *Id.* (citing *Matek*, 862 F.2d at 730-31; *Rivanna*, 840 F.2d at 241). We then affirmed the district court's directed verdict in favor of the defendants because the plaintiffs had failed to present any such evidence. *Id.*

We are faced with different circumstances here where the SEC has

proffered numerous allegations which it contends undermine the presumption that an interest in a general partnership is not a security.  This case persuades us that, like a number of other circuits,[9] we should adopt the Fifth Circuit's approach in *Williamson* and apply its three non-exhaustive examples of how the presumption may be rebutted.  *See Williamson*, 645 F.2d at 424 n.15 (noting that other factors could "also give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be effectively precluded").  As does the Eleventh Circuit, we view the *Williamson* approach as a supplement to controlling Supreme Court and circuit precedent in determining if allegations are sufficient to raise a fact question regarding whether a particular investment is a security.  *See Merch. Capital*, 483 F.3d at 755 ("*Williamson* is ultimately simply a guide to determining whether the partners expected to depend solely on the efforts of others, thus satisfying the *Howey* test.").

 We now turn to the central question on appeal—whether the district court erred in holding the SEC failed to plead sufficient factual allegations in its complaint to state a plausible claim that the investments at issue here satisfy the

---

[9] *See, e.g.*, *United States v. Leonard*, 529 F.3d 83, 90-91 (2d Cir. 2008) (applying *Williamson* and finding investment contract notwithstanding documents gave investors powers of control similar to general partnership); *Merch. Capital, LLC*, 483 F.3d at 755-66 (same); *Stone v. Kirk*, 8 F.3d 1079, 1086 (6th Cir. 1993) (same); *Koch v. Hankins*, 928 F.2d 1471, 1477-81 (9th Cir. 1991) (applying *Williamson* to analyze whether general partnerships were investment contracts); *Rivanna*, 840 F.2d at 241 (applying *Williamson* but holding presumption that general partnership is not a security was not rebutted).

third prong of the *Howey* test. The district court granted the motion to dismiss because facially the JVAs granted investors control over their investments through "substantial voting rights." The court noted that investors could remove GeoDynamics as Managing Venturer without cause by majority vote, develop rules and procedures for meetings, and exercise all the rights and obligations afforded to them under Texas General Partnership laws. Aplt. App. at 176 & n.5.

Investments satisfy the third prong of the *Howey* test "when the efforts made by those other than the investor are the ones which affect significantly the success or failure of the enterprise." *Banghart*, 902 F.2d at 807 (citing *Meyer v. Dans un Jardin*, 816 F.2d 533, 535 (10th Cir. 1987)); *see also Crowley v. Montgomery Ward & Co.*, 570 F.2d 875, 877 (10th Cir. 1975) (*Crowley I*) ("[T]he test is 'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" (quoting *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973))). The proper inquiry includes "an examination of the investor's powers under the terms of the agreement, the information available to and the sophistication of the investor, adequacy of financing, degree of speculation, whether or not the risks involved were normal business risks, and so on." *Maritan*, 875 F.2d at 1457. "The contribution of time and effort is only part of the test," and "[c]onsideration must be given to control over the factors essential to success of the enterprise." *Crowley II*, 570 F.2d at

-21-

880. Furthermore, because the "principal purpose of the securities acts is to protect investors by promoting full disclosure of information necessary to informed investment decisions," we have recognized that "access to information about the investment, and not managerial control, is the most significant factor," in determining whether "investors are in need of the protections of the securities acts." *Maritan*, 875 F.2d at 1457 (citation omitted). "In short, each case must be analyzed on its own facts . . . ." *Id.*

Applying these principles, we agree with the SEC that the allegations in the complaint are clearly sufficient to rebut the presumption that the purported general partnerships here are not securities, and to raise a fact issue concerning whether investors were relying on the efforts of Mr. Shields and GeoDynamics to significantly affect the success or failure of the ventures. The allegations also raise a fact issue as to whether the investors actually had the type of control reserved under the agreements to obtain access to information necessary to protect, manage, and control their investments at the time they purchased their interests.

The *Williamson* factors provide support for this conclusion. First, a general partnership or joint venture may be a security if "an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership." *Williamson*, 645 F.2d at 424. As the court explained in *Merchant Capital*, we look at "the expectations of

-22-

control at the time the interest is sold, rather than at some later time after the expectations of control have developed or evolved," 483 F.3d at 756, but "[a]s an evidentiary matter, . . . we may look at how the [general partnership] actually operated to answer the question of how control was allocated at the outset," *id.* The court noted further:

> *Williamson* also defines the kind of evidence that is to be considered in determining the expectations of control. Consistent with *Howey*'s focus on substance over form, we look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest. *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943) ("In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be."); *Gordon*, 684 F.2d at 742 ("*Williamson* requires an examination of the representations and promises made by promoters . . . to induce reliance upon their entrepreneurial abilities."); *Koch v. Hankins*, 928 F.2d 1471, 1478 (9th Cir.1991). The ultimate issue under *Howey* is whether the partners expected to rely solely on the efforts of others, and we may rely on the totality of the circumstances surrounding the offering in making this determination.

*Id.* at 756-57.

Moreover, in *Maritan* we made it clear that post-investment conduct is relevant to the intent of the parties at the time the agreement was signed, 875 F.2d at 1458-59, which Mr. Shields does not dispute. There, Maritan argued his activities were insignificant when compared to others and were "irrelevant because most of them took place two years after the agreement was signed." *Id.* We disagreed, reasoning that "*the fact and nature of Maritan's later participation*

*sheds light on how the parties regarded Maritan's rights and status under the agreement all along . . . .*" *Id.* at 1459 (emphasis added). We further agreed with the district court's statement that "[i]ntent becomes clear from the relationship which the parties accepted thereafter." *Id.* (citation omitted). We concluded that "[w]hen this transaction is correctly analyzed by focusing on Maritan's access to information, then on the agreement and Maritan's express and implied rights and powers under the agreement, all as confirmed by his subsequent actions, we are satisfied that no genuine issue of material fact remains for trial." *Id.*

The SEC contends its allegations support the conclusion that the venturers here lacked the type of control usually afforded to general partners and that they instead had the more restricted rights of a limited partner. Thus, while the JVAs did grant investors certain voting rights, including the right to remove GeoDynamics as a managing partner, the allegations in the complaint show that investors were locked into turnkey drilling and completion contracts with GeoDynamics as the contractor. Accordingly, even if they exercised their power to remove GeoDynamics as managing venturer, they were still required to rely on GeoDynamics for the success of the joint venture. The turnkey contracts were key to the success of the enterprise and profits for the investors, regardless of the venturers' power, because they were the only way these oil and gas investments could generate money. *See Merch. Capital*, 483 F.3d at 757-61 (analyzing practical inability to remove managing partner notwithstanding contractual right

to do so).

Moreover, the allegations that Mr. Shields marketed these interests to thousands of investors across the country with little or no experience in the oil and gas industry, and that he was their sole source of access to information, raise a fact issue concerning whether the voting rights were illusory or a sham. The court in *Merchant Capital* found it relevant that, as in *Howey*, 328 U.S. at 299, the investors in the partnership were "geographically dispersed, with no preexisting relationships" and determined that "the lack of face-to-face contact among the partners exacerbated the other difficulties and rendered the supposed power to remove [the managing partner] illusory." 483 F.3d at 758. The court explained further that votes are illusory when the promoter controls how much information the investors get "and [does] not submit sufficient information for the partners to be able to make meaningful decisions." *Id.*

The allegations here are sufficient to defeat a motion to dismiss on the issue of whether the investors here lacked meaningful control over their interests. *See id.* at 757-62 (analyzing how powers reserved in general partnership agreement were in reality illusory). They raise a plausible claim that the joint venture agreements, in substance as opposed to form, actually distributed powers similar to a limited partnership, which is usually held to be a security. *See SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980) ("[A] limited partnership generally is a security. . . .").

-25-

Second, we consider whether "the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers." *Williamson*, 645 F.2d at 424. The allegations that Mr. Shields marketed these oil and gas interests nationwide to investors with little, if any, experience in the oil and gas industry by means of over 400 cold calls a day clearly supports this conclusion. As the court held in *Williamson*, an investment "scheme which sells investments to inexperienced and unknowledgeable members of the general public cannot escape the reach of the securities laws merely by labeling itself a general partnership or joint venture." *Id.* at 423. The experience and knowledge referred to in *Williamson* "focus[es] on the experience of investors in the particular business, not the general business experience of the partners." *Merch. Capital*, 483 F.3d at 762 (citing *Howey*, 328 U.S. at 296). This is so because "[r]egardless of investors' general business expertise, where they are inexperienced in a particular business, they are likely to be relying solely on the efforts of the promoters to obtain their profits." *Id.*; *see also Leonard*, 529 F.3d at 90-91 ("We echo the Fifth Circuit in finding that investors may be so lacking in requisite expertise, so numerous, or so dispersed, that they become utterly dependant on centralized management counteracting a legal right of control." (citing *Williamson*, 645 F.2d at 423-24)).

Third, we ask whether "the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he

cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers." *Williamson*, 645 F.2d at 424. As we noted earlier, the SEC alleges that Mr. Shields specifically emphasized the unique expertise of GeoDynamics in the oil and gas industry during his sales pitches, so unique that he was able to offer—and investors depended on him for—estimated annualized profits between 256% and 548%. Moreover, the investors had no experience in the oil and gas business and were totally reliant on GeoDynamics and the turnkey drilling contracts for a profitable investment. These allegations raise a fact issue as to whether the investors had any practical alternative to GeoDynamics.

The district court focused only on the form of the JVAs themselves without considering the economic realities of the transactions and the investors' lack of access to information needed in order to actually use the powers reserved to them under the JVAs. When the allegations here are instead viewed in their totality, they state a plausible claim that the powers were illusory, which is sufficient to rebut the presumption that a general partnership is not a security.

In sum, it cannot be said as a matter of law that what was sold to the investors in this case are not investment contracts and therefore securities. Accordingly, we REVERSE the district court and REMAND for further proceedings consistent with this opinion.