**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FOXFIELD VILLA ASSOCIATES, LLC;
RICHARD A. BARTLETT; ERNEST J.
STRAUB, III; BARTLETT FAMILY
REAL ESTATE FUND, LLC; PRES, LLC,

    Plaintiffs - Appellants,

v.

PAUL ROBBEN; RDC HOLDINGS, LLC,

    Defendants - Appellees.

No. 18-3054

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. Nos. 2:12-CV-02528-CM and**
**2:13-CV-02120-CM-JPO)**
_____

John M. Duggan (Deron A. Anliker with him on the briefs), Duggan Shadwick Doerr &
Kurlbaum LLC, Overland Park, for Plaintiffs-Appellants.

Robert M. Pitkin, Horn Aylward & Bandy, LLC, Kansas City, Missouri, for Defendants-
Appellees.
_____

Before **LUCERO**, **HARTZ**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.
_____

    We consider whether ownership interests in a limited liability company are

securities under the Securities Exchange Act of 1934. The specific attributes of the

LLC interests in this case compel us to conclude that they are not. We thus affirm the district court's order declining to characterize the LLC interests as securities and granting summary judgment to the defendants on that basis.

I.

This appeal stems from an attempt to hold Defendant Paul Robben liable for securities fraud. In short, various Plaintiffs allege that Mr. Robben fraudulently induced them to purchase ownership interests in a Kansas limited liability company named Foxfield Villa Associates, LLC ("Foxfield"). Plaintiffs also argue that those interests were securities under the Securities Exchange Act of 1934. Plaintiffs thus maintain that Mr. Robben violated section 10(b) of the 1934 Act (its broad antifraud provision) and SEC Rule 10b-5 (an administrative regulation expounding upon that antifraud provision) when engaging in his allegedly deceitful conduct. See generally

15 U.S.C. § 78j(b) (codifying section 10(b));[1] 17 C.F.R. § 240.10b-5 (codifying SEC Rule 10b-5).[2]

The specifics are not so simple. The relevant complaint, for instance, contains 114 pages of allegations against Mr. Robben and his company RDC Holdings, LLC ("RDC")—the other defendant in this case—describing their supposedly fraudulent

---

[1] Section 10(b) contains the following language:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (footnote omitted).

[2] SEC Rule 10b-5 contains the following language:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
     (a) To employ any device, scheme, or artifice to defraud,
     (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
     (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

behavior over several years.[3]  Relatedly, the discovery process and procedural history that arose out of those detailed allegations leaves us with a long and dense appellate record.  The course of litigation also highlights the case's complexity: the district court issued stays and consolidated lawsuits, parties came and went, and myriad motions peppered the district docket.

Fortunately, we need not discuss most of those details.  The district court granted summary judgment to Mr. Robben and RDC on the sole ground that Plaintiffs' interests in Foxfield were *not* securities under the 1934 Act.  Because that narrow inquiry—rather than whether Mr. Robben and RDC's conduct was fraudulent—is the lone issue on appeal, we discuss only the factual background and circumstances that influence whether Plaintiffs' interests fall under the 1934 Act's definition of "security."

To that end, we begin by examining the history of Foxfield.  At the most basic level, Mr. Robben—an experienced residential real estate developer—conceived Foxfield as a vessel through which its members would purchase specific tracts of real estate.  Some of the targeted tracts consisted of raw land that remained undeveloped; other tracts had been developed for residential use but had not yet been built upon.  Even if further development was necessary, the hope was that the members—again

---

[3] In reality, Mr. Robben did not *directly* own RDC.  Instead, Development Services Corporation—a company that Mr. Robben directly owned—was RDC's sole member.  But because none of the parties contend that distinction is material to the outcome of this appeal, for simplicity we omit any reference to Development Services Corporation as the link between Mr. Robben and RDC.  Instead, we discuss RDC as if Mr. Robben owned and operated it outright.

4

through Foxfield—could eventually sell the acquired land for the construction of residential homes. If all had gone according to plan, the members would have earned considerable profits.

Mr. Robben eventually enlisted his acquaintances Richard Bartlett and Ernest Straub to take part in the Foxfield endeavor. Mr. Bartlett was an established businessman who had earned his wealth in the technology sector. Mr. Straub owned construction companies that specialized in both commercial and residential real estate construction. Both men had participated in real estate development projects with Mr. Robben in the past.

Even so, Mr. Bartlett and Mr. Straub were not actual *members* of Foxfield. That distinction instead belonged to the Bartlett Family Real Estate Fund, LLC ("BFREF") and PRES, LLC ("PRES"), companies which Mr. Bartlett and Mr. Straub respectively owned and operated either in full or in part. BFREF—a company Mr. Bartlett owned outright with his wife—owned a 50% interest in Foxfield. PRES, in turn, owned the remaining 50% interest in Foxfield. But unlike Mr. Bartlett's ownership of BFREF, Mr. Straub did not own PRES outright. Rather, Mr. Straub held only a 50% ownership interest in PRES. The other 50% of PRES belonged to Mr. Robben's company, RDC.

Foxfield's operating agreement governed how BFREF (read Mr. Bartlett) and PRES (read Mr. Straub *and* Mr. Robben) made decisions and took actions on behalf of the new, member-managed enterprise. Most decisions and actions—e.g., acquiring the targeted real estate, establishing the corresponding sales prices for that land, and

5

selecting and contracting with Foxfield's advisors—required only a majority in interest, which the operating agreement defined as any member or combination of members holding more than a 50% ownership interest in Foxfield. Other specified decisions and actions—e.g., loaning money to other people or entities, assuming the liabilities and obligations of other people or entities, and filing for bankruptcy—required a supermajority in interest, which the operating agreement defined as any member or combination of members holding 65% or more ownership interest in Foxfield. And still other decisions and actions—e.g., merging or consolidating Foxfield with another entity—required the unanimous consent of all members.

Practically speaking, though, the fact that Foxfield comprised only two members with equal ownership interests effectively nullified any distinction between decisions requiring a majority in interest, supermajority in interest, or unanimous consent. After all, given that BFREF and PRES each owned exactly 50% of Foxfield, even a decision requiring just a majority in interest still required the assent of *both* members; one member acting alone could not tip the scales in its favor. The same held true for decisions requiring a supermajority in interest: no individual member held 65% or more of the ownership interests in Foxfield, so both BFREF and PRES had to agree on any such decision before it could take effect. And by definition, unanimous decisions required the approval of both members.

In any event, one decision that required "only" a majority in interest was the election and removal of Foxfield's officers. The members agreed (and the operating agreement confirms) that Mr. Robben would serve in dual roles as the original

president and treasurer. And under the operating agreement, serving as president also made Mr. Robben both the chief executive officer (CEO) and chief operating officer (COO) of Foxfield. Mr. Robben accordingly managed "the day to day operations" of Foxfield and was responsible for "carr[ying] into effect" the decisions of Foxfield's members. As treasurer, Mr. Robben also had the duties of keeping Foxfield's accounts and preparing all of its financial statements.

Mr. Bartlett and Mr. Straub also served as officers of Foxfield. Mr. Bartlett acted as Foxfield's secretary. In that capacity, the operating agreement required him to attend all meetings between members and record the proceedings of those meetings. Mr. Straub, in turn, served as the company's vice president. His primary responsibility in that role was to assume the duties of the president and act in his place should Mr. Robben be unable to do so.

The operating agreement also included other provisions dictating the rights and duties of Foxfield's members. For example, the operating agreement required BFREF and PRES to "devote so much of [their] time and attention as is reasonably necessary and advisable to manage the affairs of [Foxfield] to the best advantage of [Foxfield]." Further, each member—including its designated "agent and representative"—had the right to inspect and copy any of Foxfield's financial records.

Finally, in exchange for their ownership interests, the operating agreement required BFREF and PRES to make capital contributions to Foxfield to help fund the enterprise. To that end, BFREF and PRES each made $200,000 contributions to the

7

company. Mr. Bartlett provided the entire $200,000 on behalf of BFREF. Mr. Straub and Mr. Robben, on the other hand, each provided $100,000 on behalf of PRES.[4]

Several weeks passed between the moment when BFREF and PRES bought their ownership interests in Foxfield and the moment when Foxfield acquired the targeted tracts of real estate. When that day finally arrived, Mr. Robben was the one who purchased that land on behalf of Foxfield and its members. And he did so through a resolution that BFREF and PRES had unanimously passed earlier that very same day. That resolution "authorized and empowered" Mr. Robben to execute a vast array of banking documents (such as mortgages, promissory notes, etc.) on Foxfield's behalf "in connection with the acquisition of lots, the construction of residences, and the sale of residences." The resolution, in other words, gave Mr. Robben permission to bind Foxfield and its assets without first obtaining BFREF's and PRES's—and therefore Mr. Straub's and Mr. Bartlett's—approval. Thus, in the end, Mr. Robben was no longer just the president of Foxfield who merely "carried into effect" the decisions of BFREF and PRES. Instead, as of the day the resolution passed, he could manage and control the enterprise's assets as he saw fit.

Despite that new power, Mr. Robben's efforts at using the acquired real estate to turn a profit for Foxfield and its members ultimately proved unsuccessful. In

---

[4] Relatedly, Mr. Bartlett also made an uncollateralized and uninsured $400,000 loan to Foxfield even though the operating agreement did not obligate him to do so. That loan, however, is not at issue in this appeal.

8

response, five Plaintiffs—Mr. Bartlett, Mr. Straub, BFREF, PRES, and Foxfield itself—eventually banded together and sued Mr. Robben and RDC. The relevant document includes one claim based on federal law (the securities fraud action described above) and twenty-three claims based on state law.

As we previously mentioned, the district court granted summary judgment to Mr. Robben and RDC on Plaintiffs' securities fraud claim because the court determined that BFREF's and PRES's membership interests in Foxfield were not securities (at least in the way that the 1934 Act defines that term). That left the twenty-three state law claims, over which the district court declined to exercise supplemental jurisdiction given that no other federal claims remained. See 28 U.S.C. § 1367(c)(3). The district court therefore dismissed the state law claims and entered final judgment for Mr. Robben and RDC.

Plaintiffs now appeal. They first challenge the district court's conclusion that BFREF's and PRES's membership interests in Foxfield were not securities under the 1934 Act. Because that challenge arises from the "district court's grant of summary judgment," our review is de novo. Bird v. West Valley City, 832 F.3d 1188, 1199 (10th Cir. 2016) (quoting Emcasco Ins. Co. v. CE Design, Ltd., 784 F.3d 1371, 1378 (10th Cir. 2015)). Plaintiffs also contest the district court's decision to decline supplemental jurisdiction over their remaining state law claims, an issue that we review for abuse of discretion. Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1139 (10th Cir. 2004). We exercise jurisdiction under 28 U.S.C. § 1291.

9

II.

Under the Securities Exchange Act of 1934, a "security" is not just a stock that brokers buy and sell on Wall Street. See Marine Bank v. Weaver, 455 U.S. 551, 556 (1982) (observing that "the coverage of the antifraud provisions of the securities laws is not limited to instruments traded at securities exchanges and over-the-counter markets"). That term instead encompasses a much broader set of financial instruments—as the Supreme Court summarized, "virtually any instrument that might be sold as an investment" regardless of its form or name. Reves v. Ernst & Young, 494 U.S. 56, 61 (1990); see also *Security*, Black's Law Dictionary (11th ed. 2019) ("A security indicates an interest based on an investment in a common enterprise rather than direct participation in the enterprise."). The 1934 Act itself, though, does not use that simplified description. Rather, it defines the word "security" by listing the many instruments "that in our commercial world fall within the ordinary concept of a security." United Hous. Found., Inc. v. Forman, 421 U.S. 837, 847–48 (1975) (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)). Those instruments include

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, *certificate of interest or participation in any profit-sharing agreement* or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or *in general, any instrument commonly known as a "security"*; or any certificate of interest or

10

participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10) (emphases added).[5]

Today we consider only the three instruments that we emphasize above: investment contracts, certificates of interest or participation in a profit-sharing agreement, and instruments commonly known as securities. Plaintiffs argue that BFREF's and PRES's interests in Foxfield fall under each of those labels and are therefore securities under the 1934 Act. We consider each of the three in turn.[6]

A.

---

[5] This definition of "security" under the Securities Exchange Act of 1934 is "essentially identical in meaning" to the definition of that same word under the Securities Act of 1933. SEC v. Edwards, 540 U.S. 389, 393 (2004); see also 15 U.S.C. § 77b(a)(1). For that reason, throughout this opinion we "refer to cases involving the 1933 and 1934 Acts without distinguishing between which Act each case involved." SEC v. Thompson, 732 F.3d 1151, 1158 n.5 (10th Cir. 2013) (quoting Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1538 n.3 (10th Cir. 1993)); see also Landreth Timber Co. v. Landreth, 471 U.S. 681, 686 n.1 (1985) ("We have repeatedly ruled that the definitions of 'security' in . . . the 1934 Act and . . . the 1933 Act are virtually identical and will be treated as such in our decisions dealing with the scope of the term.").

[6] Because Plaintiffs do not argue on appeal that BFREF's and PRES's interests in Foxfield constitute any other instruments that fall under the Act's definition of "security"—for example, stocks or bonds—we limit our analysis to the three instruments that Plaintiffs mention. See United States v. Yelloweagle, 643 F.3d 1275, 1280 (10th Cir. 2011) (observing that when an appellant does not pursue an issue on appeal, "we ordinarily consider the issue waived").

11

The Supreme Court first defined an "investment contract"—a term that the 1934 Act itself left undefined—nearly seventy-five years ago in SEC v. W.J. Howey Co., 328 U.S. 293 (1946). In that case, the Supreme Court held that an investment contract

> means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits *solely from the efforts of the promoter or a third party*, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

Id. at 298–99 (emphasis added). We have since deconstructed that definition into three parts: "(1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." SEC v. Scoville, 913 F.3d 1204, 1220 (10th Cir. 2019) (quoting SEC v. Shields, 744 F.3d 633, 643 n.7 (10th Cir. 2014)).

The first and second of those requirements are not at issue. Nobody disputes that BFREF and PRES made investments ($200,000 capital contributions) in a common enterprise (Foxfield). The only question is whether the profits that BFREF and PRES expected to gain as a result were "to come solely from the efforts of others." Howey, 328 U.S. at 301.

In coming to an answer, we first note that—at least in our circuit—the word "solely" in that phrase does not literally mean "solely." See Crowley v. Montgomery Ward & Co., 570 F.2d 875, 877 (10th Cir. 1975). Instead, to prevent an "unduly restrictive application" of the Howey test, we have held that the word "solely" in the Howey definition more or less means "significant[ly]." Id. The result is that "[a]n

12

investment satisfies [Howey's] third prong when the efforts made by those other than the investor are the ones which affect *significantly* the success or failure of the enterprise." Banghart v. Hollywood Gen. P'ship, 902 F.2d 805, 807 (10th Cir. 1990) (emphasis added).

We also note that our decision in Avenue Capital Management II, L.P. v. Schaden, 843 F.3d 876 (10th Cir. 2016), governs how we apply Howey's third prong when determining whether LLC ownership interests—like those that BFREF and PRES have in Foxfield—are investment contracts. See id. at 882 (determining "whether the [LLC] interests conveyed to [the plaintiffs] constitute investment contracts"). Schaden directs us to look to whether an investor in the LLC has "the ability to control the profitability of his investment, either by his own efforts or by majority vote in group ventures." Id. (quoting Gordon v. Terry, 684 F.2d 736, 741 (11th Cir. 1982)). If he does, then he "is not dependent upon the managerial skills of others." Id. (quoting Gordon, 684 F.2d at 741). Like the Howey test from which it derives, though, the Schaden analysis is not an all-or-nothing, black-or-white test. Instead, the Schaden "ability to control" test reflects our emphasis on whose efforts were the "undeniably *significant* ones," Maritan v. Birmingham Props., 875 F.2d 1451, 1457 (10th Cir. 1989) (emphasis added), and therefore operates as a sliding scale: "[t]he greater the control acquired by [the investors in the LLC], the weaker the justification to characterize their investments as investment contracts." Schaden, 843 F.3d at 882.

13

Schaden outlines six factors that we consider "in assessing [that] degree of control": (1) the investors' "access to information"; (2) the investors' "contractual powers"; (3) the investors' "contribution of time and effort to the success of the enterprise"; (4) "the adequacy of financing"; (5) "the nature of the business risks"; and (6) "the level of speculation." Id. Importantly, we list those factors in the order of their significance. The first factor—access to information—"is the most significant factor" because "the 'principal purpose of the securities acts is to protect investors by promoting full disclosure of information necessary to informed investment decisions.'" Shields, 744 F.3d at 645 (quoting Maritan, 875 F.2d at 1457). The second factor—the investors' express and implied contractual powers— follows closely behind. The reason is straightforward: regardless of "whose efforts *actually* affected the success or failure of the enterprise," an investor who has the contractual *power* to control the enterprise—even if he chooses not to use that power—has "the sort of influence" that protects him "against a dependence on others." Maritan, 875 F.2d at 1457–58 (emphasis added) (quoting Matek v. Murat, 862 F.2d 720, 730 (9th Cir. 1988)); see also Schaden, 843 F.3d at 884 ("[W]e analyze the measure of control that [the investors in the LLC] *could* exercise over [the LLC] . . . ." (emphasis added)).

The third factor—the investors' contribution of time and effort—makes clear, though, that the Schaden test does not live and die with the investors' contractual powers. Although those powers do take precedence, see supra, the investors' actual involvement in the LLC (or lack thereof) *can* clarify whether they had the ability to

14

control the profitability of their investments. But those circumstances are narrow. As we alluded to above, for example, "it [is] not enough" that the investors in the LLC were uninvolved simply because they "in fact relied on others for the management of their investment[s]" by choice. Schaden, 843 F.3d at 884 (alteration in original omitted) (quoting Williamson v. Tucker, 645 F.2d 404, 424 (5th Cir. 1981)). Instead, the investors' marginal participation in the LLC must have been because, despite any putative contractual powers to the contrary, they were in reality "so dependent on a particular manager that they [could not] replace him or otherwise exercise ultimate control." Id. (quoting Williamson, 645 F.2d at 424). Schaden's third factor therefore contemplates a practical inability to control the profitability of the investment rather than a voluntary decision not to control it. And we will generally only conclude that practical inability exists in these circumstances[7]:

    (a)    When the investors' *powers as exercised* are so insubstantial, ineffective, or illusory that the LLC is virtually indistinguishable from a limited partnership, an entity "which is usually held to be a security." Shields, 744 F.3d at 644, 647; see also Great Lakes Chem. Corp. v. Monsanto Co., 96 F. Supp. 2d 376, 391 (D. Del. 2000) (observing that limited partners generally cannot "exercise[ a] managerial role in the partnership's affairs," so courts usually treat them as "passive investors" who rely solely on the efforts of others).

---

[7] We use letters rather than numbers when listing these circumstances to emphasize that they are a subset of Schaden's third factor.

15

(b)　　When the investors *themselves* are so "inexperienced and unknowledgeable in business affairs" that they are "incapable of intelligently exercising" their powers under the LLC.  Shields, 744 F.3d at 644 (quoting Banghart, 902 F.2d at 807).

(c)　　When the *manager or promoter* of the LLC is so unique that, even if the investors do retain "some practical control" over the LLC, they still "have no realistic alternative to the manager" or promoter.  SEC v. Merch. Capital, LLC, 483 F.3d 747, 763 (11th Cir. 2007); see also Shields, 744 F.3d at 644.

See also Williamson, 645 F.2d at 424 (identifying these three circumstances for the first time); Schaden, 843 F.3d at 884 ("[W]e view the Williamson approach as a supplement to controlling Supreme Court and circuit precedent in determining . . . whether a particular investment is a security." (alteration in original) (quoting Shields, 744 F.3d at 645)).[8]

---

[8] The Williamson approach originated to rebut the "strong presumption" that general partnerships are not investment contracts.  Shields, 744 F.3d at 643 (quoting Banghart, 902 F.2d at 808); see also id. (observing that this presumption exists "because the [general] partners—the investors—are ordinarily granted significant control over the enterprise" (quoting Banghart, 902 F.2d at 808)).  Even though we also now apply the Williamson approach when LLCs are at issue, see Schaden, 843 F.3d at 884, we stress that—unlike general partnerships—we do *not* presume that LLCs are not investment contracts.  Nor, on the other hand, do we presume that LLCs are investment contracts as we would for limited partnerships.  See Shields,744 F.3d at 647.  Instead, given that LLCs "are hybrid entities that combine desirable characteristics of corporations, limited partnerships, and general partnerships," and that the creators of LLCs have "substantial flexibility" in crafting the terms of the LLCs' operating agreements, we simply proceed through each of the six Schaden

16

The fourth, fifth, and sixth <u>Schaden</u> factors—the adequacy of financing, the business risks, and the level of speculation—are the least relevant. This trio of factors can only *confirm* whether the LLC interests are investment contracts. <u>See</u> <u>Ballard & Cordell Corp. v. Zoller & Danneberg Exploration, Ltd.</u>, 544 F.2d 1059, 1065 (10th Cir. 1976) ("*Most* investment contract cases involve the financing of speculative and poorly financed schemes by soliciting funds from uninformed and unskilled investors." (emphasis added)). But they do not in and of themselves affect whether the investors in the LLC had the ability to control the profitability of their investments. <u>See</u> <u>Howey</u>, 328 U.S. at 301 ("The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative . . . ."). We therefore employ these last three factors only to corroborate our final conclusion that particular LLC interests are or are not investment contracts.

We observe two final (but still significant) principles that we must consider when weighing the six <u>Schaden</u> factors. First, <u>Schaden</u>'s "test of control is an objective one," so we do not consider "the control that [the investors in the LLC] *intended* to exercise."[9] <u>Schaden</u>, 843 F.3d at 884 (emphasis added) (quoting <u>Bailey</u>

---

factors to determine whether the "particular LLC at issue" is, in fact, an investment contract. <u>Great Lakes Chem</u>, 96 F. Supp. 2d at 383, 392.

[9] We recognize that a different rule may apply in contexts outside the LLC sphere. <u>See, e.g.</u>, <u>Shields</u>, 744 F.3d at 646 (observing that when general partnerships are at issue, we do, in fact, "look at the expectations of control" (quoting <u>SEC v. Merch. Capital, LLC</u>, 483 F.3d 747, 756 (11th Cir. 2007)).

17

v. J.W.K. Props., Inc., 904 F.2d 918, 921–22 (4th Cir. 1990)). Second, we assess the LLC investors' degree of control when they bought their interests "rather than at some later time" after the circumstances bearing on control "have developed or evolved." Shields, 744 F.3d at 646 (quoting SEC v. Merch. Capital, LLC, 483 F.3d 747, 756 (11th Cir. 2007)).

With this background in mind, we analyze each of the six Schaden factors in turn to determine whether BFREF and PRES had the ability to control the profitability of their investments in Foxfield.

1.

As we noted above, Foxfield's operating agreement allowed BFREF and PRES to inspect and copy all of Foxfield's financial records and documents. That alone powerfully suggests that BFREF and PRES had unfettered access to all necessary information about their investments. See Schaden, 843 F.3d at 883 (noting that the investors in the LLC had full access to information when "the LLC agreement expressly stated" that they "could inspect, examine, and copy" the LLC's books).

Plaintiffs retort, though, that BFREF's and PRES's broad access to *Foxfield's* information is not what matters. Rather, they claim that BFREF and PRES never had access to the financial records and documents of the company *from which* Foxfield bought the tracts of real estate. Mr. Robben could have easily drafted Foxfield's operating agreement to give BFREF and PRES access to that information, Plaintiffs argue, because he was a partial owner of that other company. And without that company's information, the argument continues, BFREF and PRES were unaware of

18

critical financial data that would have quickly proven that purchasing the tracts of real estate was a bad idea. Plaintiffs therefore maintain that BFREF and PRES— unlike Mr. Robben—lacked access to the "information necessary to protect, manage, and control their investments" in Foxfield under the first Schaden factor. Shields, 744 F.3d at 645.

The problem with Plaintiffs' argument is twofold. First, Plaintiffs direct us to no authority suggesting that LLC members in Kansas have the right to access the financial records and documents of another company. In fact, Kansas statutory law strongly implies that LLC members only have the right to access relevant information about the LLC of which they are a part. See Kan. Stat. Ann. § 17-7690(a)(1) ("Each member of a limited liability company . . . has the right . . . to obtain from the limited liability company . . . [t]rue and full information regarding the status of the business and financial condition *of the limited liability company*." (emphasis added)). We have a difficult time seeing how Schaden's first factor could cover information that BFREF and PRES probably did not have a right to access even under normal circumstances.

But even if Mr. Robben's partial ownership and intimate knowledge of that separate company instilled BFREF and PRES with such a right, see Kan. Stat. Ann. § 17-7690(a)(6) (noting that members of an LLC have the right to access "information regarding the affairs of the [LLC] as is just and reasonable"), Plaintiffs' argument fails for an even more fundamental reason. The fact that Foxfield's operating agreement did not *explicitly grant* BFREF and PRES access to the selling company's

19

information does not mean that BFREF and PRES *lacked* access to that information.

Indeed, Plaintiffs do not direct us to any evidence suggesting that some barrier stood in BFREF's and PRES's way that prevented them from obtaining that company's financial records and documents upon their request. And without that evidence, we fail to see how BFREF and PRES were at any informational disadvantage to Mr. Robben even if they were aware when they bought their interests that he *currently* possessed more information than them. After all, Foxfield did not consummate the purchase of the real estate from the selling company until several weeks after BFREF and PRES had bought into Foxfield. BFREF and PRES thus had more than sufficient time to ask for and obtain the "information necessary to protect, manage, and control their investments" before they finally authorized Mr. Robben to buy that land.[10]

Thus, because BFREF and PRES very well may not have had a right to access the selling company's information in the first place—and even if they did, no evidence suggests that they were unable to access that information—we conclude that

---

[10] To the extent Plaintiffs are arguing that BFREF and PRES needed access to the selling company's financial records and documents to avoid investing in Foxfield in the first place, we note that that inquiry is outside the scope of this appeal. That question pertains to BFREF's and PRES's *choice to* invest in Foxfield, not who had the ultimate *control over* those investments. And so by extension, that question does not affect whether BFREF's and PRES's interests were securities. See Schaden, 843 F.3d at 882 (observing that whether an LLC interest is an investment contract turns on "who has the ability to control the profitability of [the] investment" (quoting Gordon, 684 F.2d at 741)). Rather, it affects the question of fraud—specifically, whether Mr. Robben unlawfully induced BFREF and PRES to purchase their interests by failing to disclose all relevant information to them from the start. See 15 U.S.C. § 78j(b) (outlawing the use of fraudulent tactics "in connection with the purchase" of "any security").

they were aware or could have become aware when they purchased their LLC interests of the information necessary to steer the direction of their investments in Foxfield. Thus, the first Schaden factor suggests that BFREF and PRES had the ability to control the profitability of their investments.[11]

2.

BFREF's and PRES's contractual powers were extensive. Most notably, the operating agreement provided that Foxfield was member-managed, meaning that "[t]he management of the [c]ompany [was] vested in the Members." BFREF and PRES were therefore Foxfield's primary decisionmakers. Certain decisions, of course, required different *levels* of agreement among the members—some decisions required a majority in interest, others required a supermajority in interest, and still others required unanimous consent—but BFREF and PRES nonetheless remained responsible for controlling and binding Foxfield. Again, that powerfully suggests that BFREF and PRES had the ability to control the profitability of their investments at the time of purchase. See Schaden, 843 F.3d at 883 (suggesting that member-managed LLCs allow the members "direct control over" their investments).

---

[11] We emphasize that our conclusion that BFREF and PRES had full access to information under the first Schaden factor is specific to whether their interests in Foxfield were securities. For that reason, we caution future courts and parties alike to not blindly apply the principles we use today when they must analyze questions of fraud. An investor's "access to information" in that context might have a very different meaning and effect than an investor's "access to information" in the securities context. See, e.g., supra n.10.

21

True, the operating agreement also required Foxfield to have certain officers, and it specifically required the president (Mr. Robben) to run "the day to day operations" of the company. Even so, the operating agreement also explained that the president was "[s]ubject to the decisions of the [m]embers" and responsible for "caus[ing] all decisions of the [m]embers to be carried into effect." BFREF and PRES thus retained ultimate control over the president (and thus over Foxfield) under the operating agreement, especially because that agreement also gave BFREF and PRES the power to elect and remove the president. See id. ("With the power to choose and remove managers, [the members] could supervise the individuals handling day-to-day operations . . . ."). And even more, the operating agreement provided that Mr. Bartlett (the full owner of BFREF) and Mr. Straub (the partial owner of PRES) *themselves* were officers of Foxfield: Mr. Bartlett was the company's secretary, and Mr. Straub was the company's vice president. So to the extent that Foxfield's officers had a say in the company's management, BFREF's and PRES's own members were among those officers.

Finally, the operating agreement commanded Foxfield's members to "devote so much of [their] time and attention as is reasonably necessary and advisable to manage the affairs of the [c]ompany to the best advantage of the [c]ompany." While not a contractual power per se, that statement shows that, when BFREF and PRES bought their interests in Foxfield, the operating agreement envisioned they would play a significant role in managing the company and its activities.

22

Thus, because BFREF's and PRES's contractual powers were so vast, we conclude that the second Schaden factor suggests they had the ability to control the profitability of their investments in Foxfield.

3.

Despite BFREF's and PRES's broad contractual powers on paper, the fact that they were the only two members of Foxfield meant that, as we described above, *every* decision required their mutual assent in practice. Further, the fact that Mr. Robben was a 50% owner of PRES through RDC meant that, under PRES's own operating agreement, PRES could not assent to any decision itself without first obtaining Mr. Robben's consent. As a result, Foxfield could not make any binding decision without Mr. Robben's say-so.

Plaintiffs argue that this reality means Mr. Robben was "irreplaceable or otherwise insulated from" BFREF's and PRES's ultimate control, Schaden, 843 F.3d at 884, because BFREF and PRES could not dissolve Foxfield, amend its operating agreement, remove Mr. Robben as president, or even cause the company to *act*, without first getting the man's explicit approval. Cf. id. at 883–84 (concluding that the investors in the LLC controlled the profitability of their investments because, among other reasons, they had the ability to amend the LLC's operating agreement, dissolve the LLC, and remove the LLC's officers all on their own). We proceed through each of the three Williamson circumstances to determine whether the effect of these peculiarities are as crippling as Plaintiffs claim they are.

a.

23

BFREF's and PRES's powers as exercised were robust enough to avoid characterizing Foxfield as a de facto limited partnership.  Indeed, although BFREF and PRES arguably required Mr. Robben's consent to make any decision for Foxfield, the opposite also remained true—that is, Mr. Robben could not make decisions[12] on behalf of Foxfield (at least when BFREF and PRES bought their interests) without *their* consent.[13]  The relationship was symbiotic: as went BFREF and PRES, so went Mr. Robben.  And so at the very least, BFREF and PRES had the requisite powers to *prevent* Mr. Robben from acting on behalf of Foxfield.  By any measure, that amount of managerial control exceeds the "restricted rights of a limited partner."  Shields, 744 F.3d at 646; see also In re Estate of Hjersted, 175 P.3d 810, 821 (Kan. 2008) (observing that limited partners in Kansas "*must* rely on the general

_____

[12] By "decisions," we mean the enumerated decisions listed in Foxfield's operating agreement that require the assent of its members, not the day-to-day decisions that Mr. Robben could make vis-à-vis his role as Foxfield's president.

[13] Or at least, Mr. Robben could not make decisions for Foxfield without BFREF's consent.  Indeed, unlike Foxfield's operating agreement, the terms of PRES's operating agreement make clear that PRES was manager-managed (and not member-managed), and the manager at its helm was Mr. Robben's company RDC.  And so while Mr. Straub and RDC/Mr. Robben each had 50% ownership interests in PRES, RDC/Mr. Robben could make at least some decisions on behalf of PRES without Mr. Straub's consent.

But we ultimately need not decide whether RDC/Mr. Robben could vote PRES's 50% interest in Foxfield without Mr. Straub's consent.  Regardless of the answer, Mr. Robben still needed BFREF's go-ahead to make decisions for Foxfield.  The control of Foxfield was thus interdependent no matter how we slice it.  Thus, for ease of application and to prevent confusion, we act *as if* Mr. Robben needed Mr. Straub's consent to vote PRES's 50% interest in Foxfield; presuming as much makes no difference in our analysis of the issues.

partner to make decisions" and enjoy only "significantly restricted" "rights to make decisions regarding partnership operations and property" (emphasis added)).[14]

The power dynamic shifted only when BFREF and PRES passed the resolution authorizing Mr. Robben to make and execute important decisions on behalf of Foxfield. At that point, BFREF and PRES no longer even had the ability to prevent Mr. Robben from doing as he wished. But BFREF and PRES passed that resolution several weeks *after* they had purchased their Foxfield interests. Their voluntary decision to give Mr. Robben the full reins of authority therefore does not impact how Foxfield distributed power to its members when they bought their interests. If anything, passing that resolution simply confirms that BFREF and PRES possessed and used significant managerial powers to control how Foxfield operated. See Shields, 744 F.3d at 646 ("[W]e may look at how the [enterprise] actually operated to answer the question of how control was allocated at the outset" (quoting Merch. Cap, 483 F.3d at 646)).

BFREF and PRES nonetheless direct us to various pieces of evidence suggesting that, when they bought their interests, everybody involved (including Mr. Robben) expected Mr. Robben to run and control Foxfield. But even if we assume that is true—and, to take it a step further, even if we assume that the relevant parties

---

[14] Plaintiffs make a half-hearted argument that the relevant comparison is not whether BFREF's and PRES's *powers* were much like that of a limited partner, but whether BFREF and PRES had *limited liability* like a limited partner. Our precedent makes clear that Plaintiffs are mistaken. See Shields, 744 F.3d at 647 (analyzing whether a general partnership "*actually distributed powers* similar to a limited partnership" (emphasis added)).

25

intended from the start to pass a resolution granting Mr. Robben plenary powers—

BFREF and PRES fare no better. As we described above, Schaden prescribes that, at

least in the LLC context, "the test of control is an objective one." Schaden, 843 F.3d

at 884 (quoting Bailey, 904 F.2d at 921–22). The relevant inquiry thus concerns how

much control BFREF and PRES "could exercise" over Foxfield at the time of

purchase, not whether they "expect[ed]" Mr. Robben to solely manage the enterprise.

Id. Accordingly, BFREF and PRES's professed intention (and subsequent choice) to

*act* in a more limited manner is immaterial; the important detail is that, in reality,

their powers were more like those that general partners possess. See Banghart, 902

F.2d at 808 (observing that general partners possess "powers of control and

supervision").

Thus, because BFREF and PRES could (and in fact did) exercise a fair amount

of control over Foxfield and Mr. Robben in practice, they were not de facto limited

partners under the first Williamson circumstance.

b.

When they purchased their interests in Foxfield, both Mr. Bartlett and Mr.

Straub possessed enough experience and knowledge in business affairs to

intelligently exercise their powers under Foxfield's operating agreement. Their later

use of those powers—i.e, passing the resolution—confirms as much.

True, this second Williamson circumstance primarily "focuses on the

experience of investors in the *particular* business, not the general business

experience of the partners," and we acknowledge that neither Mr. Bartlett nor Mr.

26

Straub were real estate developers by trade.  Shields, 744 F.3d at 647 (alteration in original omitted) (emphasis added) (quoting Merch. Capital, 483 F.3d at 762).  Even so, both men had participated in real estate development projects with Mr. Robben in the past, and Mr. Straub in particular would have also been at least marginally familiar with the real estate development industry through his expertise in real estate construction.  And so while Mr. Bartlett and Mr. Straub were not *as* experienced as Mr. Robben, they were also not naïve or unsophisticated newcomers to the real estate industry who lacked the ability to *intelligently* exercise their powers under Foxfield's operating agreement.  Cf., e.g., id. (concluding that the plaintiffs established the second Williamson circumstance when the enterprise at issue had involved "oil and gas interests" and the investors in the enterprise, whom the marketer had solicited by telephone cold calls, had possessed "little, if any, experience in the oil and gas industry"); Merch. Capital, 483 F.3d at 762 (concluding that the plaintiffs established the second Williamson circumstance when the enterprise at issue had involved "the debt purchasing business" and the investors in the enterprise had been "members of the general public"—specifically, "a railroad retiree, a housewife, and a nurse"—who had "had no experience" in that business).

Further, our focus on the experience of the investors in the particular business does not mean that their general business experience is irrelevant.  And here, the broad experience of Mr. Bartlett (a technology businessperson) and Mr. Straub (a real estate construction businessperson) in general business practices can only substantiate the idea that they knew how to intelligently exercise their powers under

27

the operating agreement. At the very least, their substantial general business experience undercuts the opposite idea that they were *unintelligent* in that regard.

Consequently, because Mr. Bartlett and Mr. Straub were capable of intelligently exercising their powers under Foxfield's operating agreement, the second Williamson circumstance also does not show that BFREF and PRES had a practical inability to control the profitability of their investments.

c.

Mr. Robben did not possess an "entrepreneurial or managerial ability" so unique that BFREF and PRES had no realistic option except to rely on his efforts to control the profitability of their investments in Foxfield. Shields, 744 F.3d at 644 (quoting Banghart, 902 F.2d at 807). BFREF and PRES had at least one other realistic option on which to rely when they bought their investments: their own entrepreneurial and managerial abilities.

We recognize that was not the *preferable* option. Indeed, without Mr. Robben's input, BFREF and PRES may have lacked the insight of a man who, as the then-partial-owner of the targeted real estate, was intimately familiar with that land. Plaintiffs also allege that Mr. Robben guaranteed profits to BFREF and PRES by promising to re-buy some of the land from Foxfield at a later date for a substantial sum. If true, BFREF and PRES may have honestly believed when they bought their interests that foregoing Mr. Robben's help would have been foolish because only he could deliver those guaranteed profits.

28

But a realistic alternative is not necessarily a preferable one.  For instance, although Mr. Robben's familiarity with the targeted real estate was advantageous, it was not so extraordinary that it effectively prevented BFREF and PRES from researching the land themselves and independently determining whether they should assent to its purchase.  Perhaps that option would have taken longer or been more difficult given their limited (but material) experience in real estate development, but it was an available option all the same.  Further, even if Mr. Robben did in fact guarantee profits to BFREF and PRES via his own promise to re-buy the land in the future, nothing prevented BFREF and PRES from rejecting that offer and testing the waters to see whether a more lucrative option was available.  Declining supposedly surefire profits in the hope of making even more money would have been risky and perhaps even unwise (especially because hindsight now suggests that doing so may have been futile).  Even so, that does not change the fact that, when they bought their interests in Foxfield, BFREF and PRES had a realistic alternative to relying on Mr. Robben's efforts to make their investments profitable.  Cf., e.g., Shields, 744 F.3d at 647–48 (concluding that a fact issue existed as to whether *unexperienced* investors had a realistic alternative to the manager of the enterprise under the third Williamson circumstance when the manager promised them substantial profits *and* the unexperienced investors lacked meaningful managerial powers); Merch. Capital, 483 F.3d at 764 (concluding that the investors had no realistic alternative to the manager of the enterprise under the third Williamson circumstance when the manager "effectively had permanent control over [the investors'] assets").

To be sure, we also recognize that Mr. Robben, as we have discussed, had a de facto veto power that prevented BFREF and PRES from acting on their own without his additional consent.  So even if BFREF and PRES wanted to spurn Mr. Robben's offer of guaranteed profits and pursue profits in another manner, they would have had to persuade him to go along with them.  But we do not believe that de facto veto power—at least when the investors in the LLC also have a reciprocal veto power—is so unique as to satisfy the third Williamson circumstance.  Such a holding would transform many run-of-the-mill LLC interests into securities even when the investors retain a significant managerial power that makes them something more than limited partners—namely, the power to prevent the manager or promoter from acting.  See supra.  We do not think that the third Williamson circumstance applies to such a common way to structure and organize an LLC.  Rather, the word "unique" in that circumstance is narrower in scope and refers to entrepreneurial and managerial abilities specific to a particular manager or promoter.  But as we described above, even if Mr. Robben's abilities were unique, they were not *so* unique under the facts here that they effectively required BFREF and PRES to depend on them.  His veto power aside, BFREF and PRES had realistic alternatives to exclusively relying on his efforts.

The third <u>Williamson</u> circumstance therefore does not establish that BFREF and PRES had a practical inability to control the profitability of their investments in Foxfield.[15]

4.

BFREF and PRES financed Foxfield with capital contributions in the hundreds of thousands of dollars, which could suggest that Foxfield was initially a poorly financed scheme. On the other hand, as we noted above, Mr. Robben allegedly promised BFREF and PRES guaranteed profits, which suggests that the business risks were low and that the enterprise was non-speculative. Thus, the adequacy of financing could suggest that BFREF's and PRES's interest in Foxfield were investment contracts, but the business risks and the level of speculation suggest that those interests were not investment contracts. <u>See</u> <u>Ballard</u>, 544 F.2d at 1065 ("Most investment contract cases involve the financing of speculative and poorly financed schemes by soliciting funds from uninformed and unskilled investors."). We need not, however, sort out these mixed signals from the final three <u>Schaden</u> factors. Again, we use these factors only to corroborate whether LLC interests are investment contracts; they do not help us determine whether the investors had the ability to control the profitability of their investments.

_____

[15] As we noted above when describing BFREF's and PRES's access to information, <u>see</u> <u>supra</u> n.11, we caution courts and parties alike not to take our conclusion that BFREF and PRES had realistic alternatives to relying on Mr. Robben's efforts to mean that Mr. Robben is not responsible for allegedly defrauding BFREF and PRES. Again, our analysis is specific to whether BFREF's and PRES's LLC interests are securities, not whether Mr. Robben engaged in fraud.

31

In conclusion, we hold that BFREF's and PRES's ownership interests in Foxfield were not investment contracts. Despite their purported expectation that Mr. Robben would solely manage their investments, the objective facts show that BFREF and PRES had the requisite access to information and contractual powers to control the profitability of those investments. And the specific circumstances of this case show that BFREF and PRES were not so dependent on Mr. Robben that they could not exercise ultimate control over their investments under any of the three Williamson circumstances. As a result, even though Mr. Robben exercised a fair amount of control over BFREF's and PRES's investments, his efforts were not so "undeniably significant," Maritan, 875 F.2d at 1457, as to satisfy the Schaden/Howey test. We therefore affirm the district court's conclusion that, "as a matter of law," BFREF's and PRES's interests in Foxfield were not securities under this first basis. Schaden, 843 F.3d at 882.

B.

Plaintiffs argue in the alternative that even if BFREF's and PRES's interests in Foxfield were not investment contracts, the company at the very least operated as a vessel through which BFREF and PRES agreed to share real-estate-development profits with one another. Plaintiffs also observe that BFREF and PRES could have obtained certificates from Foxfield reflecting as much. See Kan. Stat. Ann. § 17–76,112(c) ("Unless otherwise provided in an operating agreement, a member's interest in a limited liability company may be evidenced by a certificate of limited liability company interest issued by the limited liability company."). Plaintiffs

32

therefore conclude that BFREF's and PRES's interests in Foxfield were securities because those interests could be characterized as "certificate[s] of interest or participation in any profit-sharing agreement." See 15 U.S.C. § 78c(a)(10).

We reject Plaintiffs' argument under the Supreme Court's decision in Marine Bank v. Weaver, 455 U.S. 551 (1982). In that case, the Supreme Court held that profit-sharing agreements that are "not designed to be traded publicly" are not securities under the 1934 Act. Id. at 560; see also Landreth Timber Co. v. Landreth, 471 U.S. 681, 689 n.4 (1985) (observing that Marine Bank considered whether "a privately negotiated profit[-]sharing agreement" is a security). BFREF's and PRES's interests in Foxfield, in turn, were not designed to be traded publicly; they instead arose out of a "private transaction" between Mr. Robben, Mr. Bartlett, and Mr. Straub. Marine Bank, 455 U.S. at 559. Thus, even if BFREF's and PRES's interests could be characterized as certificates of interest or participation in a profit-sharing agreement in theory, the economic reality underlying those interests—i.e., that they were intended for private use—prevents us from ruling that they were securities. See id. at 559–60.

Plaintiffs protest that conclusion by directing us to the Supreme Court's earlier decision in Tcherepnin v. Knight, 389 U.S. 332 (1967). In that case, the Supreme Court stated that "[i]nstruments may be included within any of [1934 Act's] definitions, as [a] matter of law, *if on their face* they answer to the name or description." Id. at 339 (emphasis added) (quoting SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 351 (1943)). The Tcherepnin Court later concluded that the

33

instruments at issue in that case were securities because they answered to the description of certificates of interest or participation in any profit-sharing agreement. Id.  Plaintiffs thus argue that, under Tcherepnin, they need only look to the characteristics of BFREF's and PRES's interests in Foxfield and not the economic reality underlying those interests to prove that the interests were certificates of interest or participation in a profit-sharing agreement.

Plaintiffs are mistaken.  The Supreme Court later expounded upon its decision in Tcherepnin and observed that it had concluded that the instruments in that case were certificates of interest or participation in a profit-sharing agreement "only *after* analyzing the economic realities of the transaction." Forman, 421 U.S. at 850 n.15 (emphasis added).  So at best, Tcherepnin merely holds that courts must first examine the economic realities underlying an instrument *before* determining whether that instrument answers to the description of a certificate of interest or participation in a profit-sharing agreement.  See id.; cf., e.g., Landreth, 471 U.S. at 685–97 (holding that courts should look to a financial instrument's name and characteristics alone and not to the economic realities underlying that instrument when determining whether it is common stock).  Tcherepnin thus supports rather than contradicts our conclusion that Marine Bank requires us to do more than just connect the dots between the characteristics of a financial instrument and the characteristics of a certificate of interest or participation in a profit-sharing agreement.  See Marine Bank, 455 U.S. at 559–60; see also Landreth, 471 U.S. at 689 n.4, 690 (observing that a court must examine the "economic reality underlying" a profit-sharing agreement—a task that

34

requires uncovering whether the agreement was "privately negotiated"—when determining whether that agreement "falls within the usual concept of a security").[16]

So in sum, because BFREF and PRES did not intend to publicly trade their interests in Foxfield, those interests were not certificates of interest or participation in a profit-sharing agreement under the 1934 Act. The economic reality underlying those interests rather than their outward characteristics rules the day. BFREF's and PRES's interests in Foxfield thus were not securities under Plaintiffs' second argument.

C.

Finally, Plaintiffs argue that BFREF's and PRES's interests in Foxfield were securities because those interests were commonly known by that label. See 15 U.S.C. § 78c(a)(10) ("The term 'security' means . . . any instrument commonly known as a 'security' . . . ."). Plaintiffs note, for example, that Foxfield's operating agreement says that "an [i]nterest in [Foxfield] shall be and is a 'security' as defined in and governed by Article 8 of the Uniform Commercial Code" for "purposes of the Uniform Transfer on Death Security Registration Act or any similar applicable legislation." Given that all fifty states have accepted Article 8 of the Uniform

---

[16] In addition, the Supreme Court has also characterized the statement from C. M. Joiner Leasing on which Tcherepnin rested its conclusion—namely, that instruments "may be" securities "if on their face they answer to the name or description"—as non-binding dictum. Forman, 421 U.S. at 850. Given that statement originated as dictum, the persuasive value of the specific portion of Tcherepnin that Plaintiffs cite is far weaker.

Commercial Code, Plaintiffs argue that—quite obviously—BFREF's and PRES's interests in Foxfield must have been instruments "commonly known" as securities.

Plaintiffs also observe that Foxfield's operating agreement prohibited the company's members from transferring their interests unless they first registered those interests under the Securities Act of 1933 or obtained legal advice that they were exempt from registration requirements. Plaintiffs maintain that unless those interests were securities in the first place, BFREF and PRES would have had no reason to register those interests under the federal securities laws or obtain advice about exemption. Cf. Tcherepnin, 389 U.S. at 341 ("It seems quite apparent that . . . building and loan [lobbyists] would not have sought an exemption from the registration requirements . . . unless there was general agreement that the [Securities Act of 1933's] definition of security . . . brought building and loan shares within the purview of the 1934 Act."). Again, in Plaintiffs' eyes, that means BFREF's and PRES's interests in Foxfield must have been commonly known as securities as a matter of simple logic.

But once again, Plaintiffs focus solely on the characteristics of BFREF's and PRES's interests in Foxfield, not the economic realities of those interests. See supra. And like certificates of interest or participation in a profit-sharing agreement, the Supreme Court has held that courts must examine those economic realities when evaluating whether a financial instrument is one commonly known as a security. See Forman, 421 U.S. at 851–52 (commanding courts to "examine . . . the economic realities of the transaction" when determining whether an instrument is commonly

36

known as a security). This time around, however, the economic-reality analysis does not focus on the public or private nature of the instrument. Rather, the Supreme Court has held that the Howey test for investment contracts is the proper economic measure here. See Landreth, 471 U.S. at 691 n.5 (holding that "the Howey test . . . appl[ies]" when a court must determine whether an instrument is one commonly known as a security); see also Forman, 421 U.S. at 852 ("We perceive no distinction . . . between an investment contract and an instrument commonly known as a security." (internal quotation marks omitted)). And because BFREF's and PRES's ownership interests in Foxfield do not survive Howey, see supra, that means BFREF's and PRES's interests also were not instruments commonly known as securities even if the characteristics of those interests suggested otherwise.

Thus, like their first two attempts, Plaintiffs' third and final basis for arguing that BFREF's and PRES's interests in Foxfield were securities fails in the end. As a result, we conclude that those interests were not securities under the 1934 Act, and we affirm the district court's grant of summary judgment to Mr. Robben and RDC on that claim.

III.

As a final note, Plaintiffs argue that the district court abused its discretion by declining supplemental jurisdiction over their twenty-three remaining state law claims. In support, Plaintiffs observe that nearly four years have passed since they filed their relevant complaint, that the parties have engaged in a great deal of

37

discovery and filed many motions, and that the parties have already filed and objected to the pretrial order. Thus, after considering "the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness," Anglemyer v. Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995) (quoting Thatcher Enters. v. Cache Cty. Corp., 902 F.2d 1472, 1478 (10th Cir. 1990)), Plaintiffs maintain that "[r]equiring the parties to start over again in state court is an affront to judicial economy," especially since that would lead to "dramatically increasing" litigation costs.

For its part, the district court declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) because it concluded that the copious state law issues warranted a Kansas state court's consideration in the absence of the sole federal claim. Further, the district court determined that retaining this case in federal court might lead to inconsistent findings of fact or law given that a similar, corollary case already existed in Kansas state court.

We discern no abuse of discretion. "[A] district court should normally dismiss supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial." United States v. Botefuhr, 309 F.3d 1263, 1273 (10th Cir. 2002). With that said, "we have [also] suggested that it is appropriate, perhaps even advisable, for a district court to retain supplemented state claims after dismissing all federal questions when the parties have already expended a great deal of time and energy on the state law claims." Id. (citing Anglemyer, 58 F.3d at 541). But a district court does not abuse its discretion

38

just because it defies an appropriate and advisable *suggestion*—at least as long as it gives good reasons for doing so. <u>See</u> <u>id.</u> We believe that the many state law claims—twenty-three, to be exact—are a good enough reason under the abuse-of-discretion standard to send this case to the Kansas state courts despite the significant resources that the parties have expended in federal court.

We therefore affirm the district court's decision to decline supplemental jurisdiction over the remaining state law claims.

IV.

For the reasons we describe above, we AFFIRM.